UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GERALDINE BOYLE, ANDREW FOTOS, PATRICIA FOTOS, JAMIE GRASHORN, ROBERT MITILIER, ANDREA MOORE, ERIC BEST, JOANIE BEST, KATHERINE MARSH, PAUL MARSH, DANIEL MEEKS, VONITA WATSON, PETER CUNNINGHAM, BRIAN FARRAR, SANDRA FARRAR, WILLIAM GOMEZ, STEVEN MACHALA, DEREK SPUDICH, SARA ANGEL, KEVIN CALDERWOOD, ANDREW LUKE, CAROL REYNOLDS, MARK DESAUTELS, SEAN HOGAN, DOUGLAS SCHWAB, LATAVIUS BANKS, CLERGY FINANCIAL LLC, TRACY KUSS, MICHAEL LANG, JULIE LANG, KRISTIN SCHROEDER, JASON SCHROEDER, PAUL THEISEN, LAWRENCE WRIGHT, DARYL PALUBIAK, GROVE MOTOR COMPANY, AMY ROWLETT, MICHAEL THOMPSON, JEREMY BURTON, REBECCA BURTON, SONJA CARNEY, BAO LAM, JUSTIN PHILLIPS, SHERALYNN SLOAN, DAVID BOWER, ROBERT FOSTER, STEVEN SCOTT, CODY CURRY, SEAN FRAZEE, WHITNEY DAVIS, TRENTON DAVIS, JOYCE MORRIS, LARRY MORRIS, JOE RUPERT JR, CHRISTOPHER WADE, SHERRI WHEELER, HAROLD WHEELER, CHE ARBIZU, LULA CAUSEY, CHARLES CAUSEY, ANGELA DAVID, MICHAEL DZIEWECZYNSKI, EVYNNE FAIR, GLENN FAIR, GLENN GREENLEY, SHAWN TIANI AND CINDY WIGGS,<br><br>Plaintiffs,<br><br>vs.<br><br>FCA US, LLC,<br><br>Defendant | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CASE NO.<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Geraldine Boyle, Andrew Fotos, Patricia Fotos, Jamie Grashorn, Robert Mitilier, Andrea Moore, Eric Best, Joanie Best, Katherine Marsh, Paul Marsh, Daniel Meeks, Vonita Watson, Peter Cunningham, Brian Farrar, Sandra Farrar, William Gomez, Steven Machala, Derek Spudich, Sara Angel, Kevin Calderwood, Andrew Luke, Carol Reynolds, Mark Desautels, Sean Hogan, Douglas Schwab, Latavius Banks, Clergy Financial LLC, Tracy Kuss, Michael Lang, Julie Lang, Kristin Schroeder, Jason Schroeder, Paul Theisen, Lawrence Wright, Daryl Palubiak, Grove Motor Company, Amy Rowlett, Michael Thompson, Jeremy Burton, Rebecca Burton, Sonja Carney, Bao Lam, Justin Phillips, Sheralynn Sloan, David Bower, Robert Foster, Steven Scott, Cody Curry, Sean Frazee, Whitney Davis, Trenton Davis, Joyce Morris, Larry Morris, Joe Rupert Jr, Christopher Wade, Sherri Wheeler, Harold Wheeler, Che Arbizu, Lula Causey, Charles Causey, Angela David, Michael Dzieweczynski, Evynne Fair, Glenn Fair, Glenn Greenley, Shawn and Cindy Wiggs ("Plaintiffs") file this Complaint complaining of FCA US, LLC and respectfully shows the Court as follows:

**PARTIES**

**Arizona Plaintiffs**

**Gerladine Boyle**

1. Plaintiff Geraldine Boyle is a citizen and resident of the State of North Carolina who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP62NW128930 (hereinafter, the "Vehicle") on or about September 23, 2022 from Carvana in Tempe, Arizona. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

2. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

3. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

4. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

5. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

6. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

7. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

8. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Andrew Fotos and Patricia Fotos**

9. Plaintiffs Andrew Fotos and Patricia Fotos are citizens and residents of the State of Arizona who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP60PW529444 (hereinafter, the "Vehicle") on or about October 29, 2022 from Earnhardt's Jeep in Gilbert, Arizona. Plaintiffs leased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

10. Plaintiffs made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

11. Prior to Plaintiffs' lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or

exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

12. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

13. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

14. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away

from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it.

15. At the time of the lease, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

16. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Jamie Grashorn**

17. Plaintiff Jamie Grashorn is a citizen and resident of the State of Colorado who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXR60NW245595 (hereinafter, the "Vehicle") on or about October 29, 2022 from Carvana in Tolleson, Arizona. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

18. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely

charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

19. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

20. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

21. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the

Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

22. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

23. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

24. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated May 21, 2026.

**Robert Mitilier**

25. Plaintiff Robert Mitilier is a citizen and resident of the State of Arizona who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB6XN8716742 (hereinafter, the "Vehicle") on or about October 27, 2022 from Bill Luke Chrysler Jeep & Dodge in Phoenix, Arizona. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

26. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

27. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

28. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

29. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

30. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that

was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

31. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

32. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Andrea Moore**

33. Plaintiff Andrea Moore is a citizen and resident of the State of Arizona who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP68PW501164 (hereinafter, the "Vehicle") on or about September 23, 2022 from AutoNation in Phoenix, Arizona. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

34. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

35. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

36. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

37. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

38. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

39. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

40. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

## **Arkansas Plaintiffs**

**Eric Best and Joanie Best**

41. Plaintiffs Eric Best and Joanie Best are citizens and residents of the State of Arkansas who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB65N8718060 (hereinafter, the "Vehicle") on or about August 26, 2025 from Crain Hyundai of Fort Smith in

Fort Smith, Arkansas. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

42. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

43. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

44. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

45. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

46. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

47. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

48. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Katherine Marsh and Paul Marsh**

49. Plaintiffs Katherine Marsh and Paul Marsh are citizens and residents of the State of Arkansas who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYC62N8725272 (hereinafter, the "Vehicle") on or about March 28, 2023 from Campbell Chrysler Dodge Jeep RAM in Benton, Arkansas. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

50. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

51. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle.

Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

52. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

53. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

54. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

55. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

56. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Daniel Meeks**

57. Plaintiff Daniel Meeks is a citizen and resident of the State of Arkansas who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4RJYB65N8715482 (hereinafter, the "Vehicle") on or about August 21, 2024 from Teeter Motors in Malvern, Arkansas. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

58. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

59. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

60. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

61. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

62. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

63. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

64. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Vonita Watson**

65. Plaintiff Vonita Watson is a citizen and resident of the State of Arkansas who leased, then purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXR60NW163091 (hereinafter, the "Vehicle") on or about January 2, 2023 from Landers CDJR in Little Rock, Arkansas. Plaintiff leased, then purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

66. Plaintiff made the decision to lease, then purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing, then purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease, then purchase.

67. Prior to Plaintiff's lease, then purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or

exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

68. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased, then purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

69. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

70. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing, then purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors

and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased, then purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased, then purchased the Vehicle or would have paid substantially less for it.

71. At the time of the lease, then purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased, then purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

72. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Cindy Wiggs**

73. Plaintiff Cindy Wiggs is a citizen and resident of the State of Arkansas who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP68NW154514 (hereinafter, the "Vehicle") in March 2026 from Jay Hodge Ford Morrilton in Morriltown, Arkansas. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

74. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely

charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

75. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

76. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

77. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the

Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

78. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

79. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

80. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Illinois Plaintiffs**

**Peter Cunningham**

81. Plaintiff Peter Cunningham is a citizen and resident of the State of Illinois who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP67PW514360 (hereinafter, the "Vehicle") on or about September 1, 2022 from Hawk Chrysler Dodge Jeep Ram in Forest Park, Illinois. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

82. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

83. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the

Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

84. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

85. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

86. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

87. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

88. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Brian Farrar and Sandra Farrar**

89. Plaintiffs Brian Farrar and Sandra Farrar are citizens and residents of the State of Illinois who leased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP65NW267739 (hereinafter, the "Vehicle") on or about September 2, 2022 from Ray Chrysler Dodge Jeep Ram in Fox Lake, Illinois. Plaintiffs leased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

90. Plaintiffs made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be

free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

91. Prior to Plaintiffs' lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

92. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

93. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions

accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

94. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it.

95. At the time of the lease, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

96. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**William Gomez**

97. Plaintiff William Gomez is a citizen and resident of the State of Illinois who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR67PW502447 (hereinafter, the "Vehicle") on

or about September 24, 2022 from Larry Roesch Chrysler Jeep Dodge RAM in Elmhurst, Illinois. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

98. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

99. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

100. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

101. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

102. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

103. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

104. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Steven Machala**

105. Plaintiff Steven Machala is a citizen and resident of the State of Illinois who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP69PW557646 (hereinafter, the "Vehicle") on or about October 1, 2022 from Fields Jeep in Glenview, Illinois. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

106. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

107. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

108. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

109. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

110. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

111. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

112. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated March 18, 2026.

**Derek Spudich and Sara Angel**

113. Plaintiffs Derek Spudich and Sara Angel are citizens and residents of the State of Illinois who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP62PW537609 (hereinafter, the "Vehicle") on or about September 25, 2022 from Cassen and Sons CDJR in Glen Carbon, Illinois. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

114. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

115. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

116. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

117. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

118. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

119. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs

suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

120. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated May 21, 2026.

**Maine Plaintiffs**

**Kevin Calderwood**

121. Plaintiff Kevin Calderwood is a citizen and resident of the State of Maine who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP69MW642045, in May 2021 from Bessey Motor Sales in Oxford, Maine and a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP64NW264203, in August 2022 from Bodweells CDJR in Brunswick, Maine. Plaintiff purchased the vehicles for personal, family or household use. Plaintiff always used the vehicles in the normal and expected manner.

122. Plaintiff made the decision to purchase the Vehicles after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicles based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicles' alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicles, Plaintiff relied on FCA's warranty that the vehicles would be free of defects in materials and workmanship, including in the vehicles' electric battery, at the time of lease.

123. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicles. Plaintiff reasonably expected that the Vehicles, including their electric batteries, would function normally

in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicles would be capable of being charged without compromising its safety or exposing the Vehicles to a risk of fire. Plaintiff reasonably expected that the Vehicles could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicles would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

124. The Vehicles had less than 100,000 miles and was still covered by the express warranty when the vehicles were purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicles had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

125. As a result of the defects, Plaintiff's Vehicles were subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicles' electric battery. As a result, the range of Plaintiff's Vehicles was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicles suffered, the vehicle's range was diminished, and the eMPG of the Vehicles was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicles outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicles to the elements.

126. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicles. Had Plaintiff known

that the Vehicles presented a risk of a catastrophic fire, that the use of the Vehicles' electric battery would be prohibited or that Plaintiff would be forced to park the Vehicles outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicles to the weather and the elements, Plaintiff would not have purchased the Vehicles or would have paid substantially less for them. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicles' electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicles or would have paid substantially less for them.

127. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicles, Plaintiff would not have purchased the Vehicles or would have paid substantially less for them. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicles' acquisition.

128. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated June 26, 2026.

**Andrew Luke**

129. Plaintiff Andrew Luke is a citizen and resident of the State of Maine who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP67MW799640 (hereinafter, the "Vehicle") on or about November 29, 2021 from Bodwell CJDR in Brunswick, Maine. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

130. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff

chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

131. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

132. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

133. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle

was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

134. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

135. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

136. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Carol Reynolds**

137. Plaintiff Carol Reynolds is a citizen and resident of the State of Maine who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP61NW280861 (hereinafter, the "Vehicle") on or about October 21, 2022 from Shepard CDJR in Thomaston, Maine. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

138. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

139. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the

Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

140. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

141. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

142. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less

for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

143. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

144. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Maryland Plaintiffs**

**Mark Desautels**

145. Plaintiff Mark Desautels is a citizen and resident of the State of Maryland who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP62NW236576 (hereinafter, the "Vehicle") on or about October 1, 2022 from Ourisman Jeep of Bethesda in Chevy Chase, Maryland. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

146. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality

vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

147. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

148. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

149. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which

Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

150. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

151. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

152. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Sean Hogan**

153. Plaintiff Sean Hogan is a citizen and resident of the State of Maryland who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP62PW577575 (hereinafter, the "Vehicle") on or about October 29, 2022 from Heritage CDJR Parkville in Parkville, Maryland. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

154. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

155. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

156. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

157. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

158. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that

was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

159. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

160. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Douglas Schwab**

161. Plaintiff Douglas Schwab is a citizen and resident of the State of Maryland who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR66PW562459 (hereinafter, the "Vehicle") on or about October 28, 2022 from Timbrook CDJR in Cumberland, Maryland. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

162. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

163. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

164. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

165. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

166. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

167. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

168. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Minnesota Plaintiffs**

**Latavius Banks**

169. Plaintiff Latavius Banks is a citizen and resident of the State of Georgia who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP60MW860469 (hereinafter, the "Vehicle") on or about March 6, 2025 from Lincoln of Bloomington in Bloomington, Minnesota. Plaintiff

purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

170. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

171. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

172. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

173. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

174. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

175. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

176. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Clergy Financial LLC**

177. Plaintiff Clergy Financial LLC is a Minnesota LLC that leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR62PW514456 (hereinafter, the "Vehicle") on or about September 16, 2022 from Barnett CJDR in White Bear Lake, Minnesota. Plaintiff always used the vehicle in the normal and expected manner.

178. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

179. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in

accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

180. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

181. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

182. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that

the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

183. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

184. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Tracy Kuss**

185. Plaintiff Tracy Kuss is a citizen and resident of the State of Minnesota who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR67MW738768 (hereinafter, the "Vehicle") on or about June 1, 2023 from Buerkle Honda in Vadnais Heights, Minnesota. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

186. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff

chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

187. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

188. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

189. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle

was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

190. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

191. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

192. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Michael Lang and Julie Lang**

193. Plaintiffs Michael Lang and Julie Lang are citizens and residents of the State of Minnesota who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP62MW839378 (hereinafter, the "Vehicle") on or about October 3, 2024 from Morries Golden Valley Cadillac in Golden Valley, Minnesota. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

194. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

195. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably

expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

196. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

197. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

198. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid

substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

199. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

200. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Kristin Schroeder and Jason Schroeder**

201. Plaintiffs Kristin Schroeder and Jason Schroeder are citizens and residents of the State of Indiana who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP65MW643449 (hereinafter, the "Vehicle") on or about April 28, 2023 from Jeff Belzer CDJR New Prague in New Prague, Minnesota. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

202. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would

be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

203. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

204. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

205. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions

accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

206. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

207. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

208. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Paul Theisen**

209. Plaintiff Paul Theisen is a citizen and resident of the State of Minnesota who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR65MW606821 (hereinafter, the "Vehicle")

on or about February 16, 2022 from Park Chrysler Jeep in Burnsville, Minnesota. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

210. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

211. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

212. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

213. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

214. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

215. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

216. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Lawrence Wright**

217. Plaintiff Lawrence Wright is a citizen and resident of the State of Minnesota who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR63MW754000 (hereinafter, the "Vehicle") on or about August 9, 2021 from Bloomington CJDR in Bloomington, Minnesota. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

218. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

219. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

220. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

221. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

222. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

223. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

224. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**North Carolina Plaintiffs**

**Daryl Palubiak**

225. Plaintiff Daryl Palubiak is a citizen and resident of the State of North Carolina who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB67N8749634 (hereinafter, the "Vehicle") on or about October 12, 2022 from Hendrick Chrysler Dodge Jeep Ram Fiat of Concord in Concord, North Carolina. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

226. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

227. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

228. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

229. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

230. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

231. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

232. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Grove Motor Company**

233. Plaintiff Grove Motor Company is a North Carolina corporation that purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYE60N8715773 (hereinafter, the "Vehicle") on or about September 17, 2022 from Randy Marion CDJR in Salisbury, North Carolina. Plaintiff always used the vehicle in the normal and expected manner.

234. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

235. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked

and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

236. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

237. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

238. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the

elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

239. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

240. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Amy Rowlett**

241. Plaintiff Amy Rowlett is a citizen and resident of the State of North Carolina who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP64PW542133 (hereinafter, the "Vehicle") on or about October 1, 2022 from Hendrick CDJRF Wilmington in Wilmington, North Carolina. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

242. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality

vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

243. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

244. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

245. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which

Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

246. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

247. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

248. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Michael Thompson**

249. Plaintiff Michael Thompson is a citizen and resident of the State of South Carolina who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP62PW502343 (hereinafter, the "Vehicle") on or about October 1, 2022 from Vann Underwood CDJR in Whiteville, North Carolina. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

250. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

251. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

252. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

253. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

254. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that

was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

255. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

256. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated May 21, 2026.

**Ohio Plaintiffs**

**Jeremy Burton and Rebecca Burton**

257. Plaintiffs Jeremy Burton and Rebecca Burton are citizens and residents of the State of Kentucky who purchased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP6XNW275867 (hereinafter, the "Vehicle") on or about October 29, 2022 from Germain CDJRF of Sidney in Sidney, Ohio. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

258. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would

be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

259. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

260. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

261. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions

accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

262. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

263. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

264. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Sonja Carney**

265. Plaintiff Sonja Carney is a citizen and resident of the State of Ohio who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR62PW500931 (hereinafter, the "Vehicle") on or about

September 1, 2022 from Ken Ganley CDJR Mentor in Mentor, Ohio. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

266. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

267. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

268. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

269. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

270. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

271. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

272. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Bao Lam**

273. Plaintiff Bao Lam is a citizen and resident of the State of Ohio who leased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP66NW280628 (hereinafter, the "Vehicle") on or about October 1, 2022 from John Hinderer CDJR in Heath, Ohio. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

274. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

275. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in

accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

276. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

277. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

278. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that

the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

279. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

280. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Justin Phillips**

281. Plaintiff Justin Phillips is a citizen and resident of the State of Ohio who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP64PW502571 (hereinafter, the "Vehicle") on or about September 3, 2022 from Performance Jeep Georgesville in Columbus, Ohio. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

282. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff

chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

283. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

284. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

285. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle

was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

286. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

287. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

288. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated February 9, 2026.

**Sheralynn Sloan**

289. Plaintiff Sheralynn Sloan is a citizen and resident of the State of Ohio who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP64PW529298 (hereinafter, the "Vehicle") on or about October 7, 2022 from Valley Motor City in Cuyahoga Falls, Ohio. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

290. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

291. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the

Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

292. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

293. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

294. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

295. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

296. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**David Bower**

297. Plaintiff David Bower is a citizen and resident of the State of Ohio who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR61PW576799 (hereinafter, the "Vehicle") on or about November 14, 2022 from Tom Ahl CDJR in Lima, Ohio. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

298. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be

free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

299. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

300. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

301. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying

FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

302. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

303. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

304. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Robert Foster**

305. Plaintiff Robert Foster is a citizen and resident of the State of Ohio who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP64PW515272 (hereinafter, the "Vehicle") in November

2022 from Jeff Wyler Eastgate Auto Mall in Batavia, Ohio. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

306. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

307. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

308. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

309. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

310. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

311. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

312. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Steven Scott**

313. Plaintiff Steven Scott is a citizen and resident of the State of Ohio who purchased a 2023 Jeep Grand Cherokee 4xe, VIN 1C4RJYB63N8756015 (hereinafter, the "Vehicle") in December 2022 from Performance CDJR in Delaware, Ohio. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

314. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

315. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

316. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

317. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

318. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

319. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

320. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Cody Curry**

321. Plaintiff Cody Curry is a citizen and resident of the State of Ohio who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR60PW502337 (hereinafter, the "Vehicle") in December 2022 from Cronin CDJR in Lebanon, Ohio. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

322. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff

chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

323. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

324. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

325. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle

was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

326. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

327. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

328. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated February 9, 2026.

**Sean Frazee**

329. Plaintiff Sean Frazee is a citizen and resident of the State of Ohio who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR63PW514238 (hereinafter, the "Vehicle") in December 2022 from Mark Porter CDJR in Pomeroy, Ohio. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

330. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

331. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the

Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

332. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

333. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

334. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less

for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

335. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

336. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated May 21, 2026.

**West Virginia Plaintiffs**

**Whitney Davis and Trenton Davis**

337. Plaintiffs Whitney Davis and Trenton Davis are citizens and residents of the State of West Virginia who purchased a 2023 Jeep Grand Cherokee 4xe, VIN 1C4RJYB67P8791224 (hereinafter, the "Vehicle") on or about September 21, 2024 from Goldy CDJR in Huntington, West Virginia. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

338. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality

vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

339. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

340. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

341. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for

which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

342. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

343. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

344. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Joyce Morris and Larry Morris**

345. Plaintiffs Joyce Morris and Larry Morris are citizens and residents of the State of West Virginia who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR61PW557542 (hereinafter, the "Vehicle") on or about September 23, 2022 from Goldy Chrysler Dodge Jeep Ram Trucks in Huntington, West Virginia. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

346. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

347. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

348. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

349. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

350. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric

range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

351. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

352. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Joe Rupert Jr**

353. Plaintiff Joe Rupert Jr is a citizen and resident of the State of Kentucky who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB69N8757928 (hereinafter, the "Vehicle") on or about January 20, 2023 from Goldy CDJR in Huntington, West Virginia. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

354. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of lease.

355. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

356. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was leased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

357. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

358. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

359. At the time of the lease, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

360. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Christopher Wade**

361. Plaintiff Christopher Wade is a citizen and resident of the State of West Virginia who purchased a 2023 Jeep Grand Cherokee 4xe, VIN 1C4RJYC6XP8794908 (hereinafter, the "Vehicle") on or about April 1, 2024 from Harry Green CDJR in White Hall, West Virginia.

Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

362. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

363. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

364. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

365. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

366. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

367. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

368. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Sherri Wheeler and Harold Wheeler**

369. Plaintiffs Sherri Wheeler and Harold Wheeler are citizens and residents of the State of West Virginia who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYD67N8716730 (hereinafter, the "Vehicle") on or about August 26, 2023 from Greenbrier Motors in Lewisburg, West Virginia. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

370. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

371. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle.

Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

372. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

373. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

374. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

375. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

376. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

## Wisconsin Plaintiffs

### Che Arbizu

377. Plaintiff Che Arbizu is a citizen and resident of the State of Wisconsin who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP69MW749967 (hereinafter, the "Vehicle") on or about 2023 from Van Horn CDJR of Stoughton in Stoughton, Wisconsin. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

378. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

379. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

380. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

381. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

382. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

383. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

384. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Lula Causey and Charles Causey**

385. Plaintiffs Lula Causey and Charles Causey are citizens and residents of the State of Wisconsin who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP63MW745056 (hereinafter, the "Vehicle") on or about January 7, 2026 from Russ Darrow Mitsubishi in Waukesha, Wisconsin. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

386. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

387. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or

exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

388. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

389. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

390. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away

from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

391. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

392. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Angela David**

393. Plaintiff Angela David is a citizen and resident of the State of Wisconsin who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP63MW849062 (hereinafter, the "Vehicle") on or about October 9, 2021 from Homan CDJR in Waupun, Wisconsin. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

394. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely

charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

395. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

396. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

397. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the

Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

398. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

399. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

400. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Michael Dzieweczynski**

401. Plaintiff Michael Dzieweczynski is a citizen and resident of the State of Wisconsin who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP62MW802752 (hereinafter, the "Vehicle") on or about April 23, 2025 from Carvana in St. Cloud, Wisconsin. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

402. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

403. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

404. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

405. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

406. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that

was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

407. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

408. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 20, 2026.

**Evynne Fair and Glenn Fair**

409. Plaintiffs Evynne Fair and Glenn Fair are citizens and residents of the State of Colorado who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP65MW872116 (hereinafter, the "Vehicle") on or about April 1, 2022 from Mecum Auctions in Walworth, Wisconsin. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

410. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

411. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

412. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

413. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

414. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

415. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

416. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated May 21, 2026.

**Glenn Greenley**

417. Plaintiff Glenn Greenley is a citizen and resident of the State of Wisconsin who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP61MW840845 (hereinafter, the "Vehicle") on or about October 17, 2024 from Van Horn CDJR of Plymouth in Plymouth, Wisconsin.

Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

418. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

419. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

420. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

421. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

422. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

423. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

424. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Shawn Tiani**

425. Plaintiff Shawn Tiani is a citizen and resident of the State of Illinois who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXR6XMW716148 (hereinafter, the "Vehicle") on or about 2023 from Palmen Motors CDJR in Kenosha, Wisconsin. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

426. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's warranty that the vehicle would be free of defects in materials and workmanship, including in the vehicle's electric battery, at the time of purchase.

427. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

428. The Vehicle had less than 100,000 miles and was still covered by the express warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the express warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

429. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

430. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

431. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

432. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Defendant**

433. Defendant FCA US, LLC ("FCA") formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

434. FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands.

435. FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the United States and worldwide. FCA and/or its agents designed and manufactured Plaintiff's Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to Plaintiffs' Vehicles, with the intent that such documents be reviewed and relied on by purchasers such as Plaintiff. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

## VENUE AND JURISDICTION

436. The Court has diversity jurisdiction because Plaintiffs and FCA are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

437. This Court also has original jurisdiction to hear this case by virtue of 15 U.S.C. § 2310(d)(1)(A), the Magnuson-Moss Warranty Act, conferred under 28 U.S.C. § 1131. The amount in controversy exceeds $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

438. This Court has personal jurisdiction over FCA because FCA is a Delaware corporation and thus a citizen of Delaware. FCA conducts substantial business in this District. There are sufficient minimum contacts between FCA and Delaware such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

439. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because FCA is incorporated in this District , conducts substantial business in this District and is subject to personal jurisdiction in this District.

**FACTUAL ALLEGATIONS**

440. FCA markets and sells the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe (collectively, the "Vehicles") as safe, dependable, rugged, high-performing, and emissions-friendly hybrid-electric vehicles.

441. This action arises out of FCA's failure to disclose and then adequately repair two uniform and widespread defects in 2020-2026 Jeep Wrangler 4xe and 2022-2026 Jeep Grand Cherokee 4xe vehicles (hereinafter "Defective Vehicles" or "Vehicles"). The first defect is in the lithium-ion battery (hereinafter the "Defective Battery") in the Jeep Vehicles that has led to numerous fires, safety recalls and guidance from FCA that imposes highly restrictive limitations on consumers' use of the vehicles. The defect causes the high voltage battery to overheat, which can result in catastrophic and destructive fires, resulting in an unreasonable safety risk to the drivers and passengers of vehicles equipped with the Defective Battery. As a result of the Battery Defect, FCA issued recall nos. B9A, 95B and 68C between November 2023 and October 2025.

442. The second defect manifests when the Vehicles automatically, improperly, and frequently enter and remain stuck in the Fuel and Oil Refresh Mode ("FORM") for extended periods of time, which makes electric-only or electric assisted driving impossible (the "FORM Defect").

**The development and marketing of the Defective Vehicles.**

443. The Jeep Wrangler and Jeep Grand Cherokee are popular sport utility vehicles that FCA designs, manufactures, and sells under the Jeep brand. The Jeep brand traces its lineage to the original U.S. military Jeeps that were produced during World War II.

444. The original Jeep Cherokee was introduced in 1975 as a "a sporty, two-door version of the Wagoneer and featured bucket seats, a sports steering wheel, and racy detailing designed to appeal to younger, more adventurous drivers." In 1984, the "all-new" Jeep Cherokee was re-introduced as "the first compact four-door SUV, first uniframe construction, and first full-time 4x4 system with shift-on-the-fly capability."

445. In the 1990s, the Jeep brand continued to introduce vehicles that met consumer desires for "sporty" and "capable" sport utility vehicles (SUVs), including several iterations of the Jeep Wrangler and Grand Cherokee models. In 1993, Jeep introduced the Jeep Grand Cherokee as a mid-sized luxury SUV.

446. A few years later in 1999, the Jeep Brand also released the "the new Grand Cherokee (WJ)," which it "marketed as the most capable SUV ever." In 1997, the Jeep brand added the "super-capable Wrangler (TJ) with its new coil suspension" to its lineup.

447. In the past two decades, sensitivity to higher fuel prices and increased concern about the negative environmental effects of gas-powered vehicle emissions have resulted in a trend away from the gas-guzzling, SUV-heavy vehicle lineups that dominated the end of the 20th century. In response, manufacturers shifted towards electrification and production of hybrid-electric vehicles, which offer greater gas mileage and less emissions.

448. In 2020, FCA announced the Jeep plug-in hybrid Wrangler 4xe in response to these trends and in an effort to mitigate the poor gas mileage caused in part by its past designs. In 2022,

FCA added the Jeep Grand Cherokee 4xe to its lineup, using the same 4xe moniker it used with the Wrangler 4xe. The 4xe (or "four-by-e") name is a play on the Jeep brand's reputation for 4x4 vehicles that highlights the Defective Vehicles' rugged four-wheel drive and modern electric capabilities.

449. FCA pervasively advertised the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe as offering similar performance and capability as the gas-powered equivalents, but with all the environmental and mileage benefits of a plug-in hybrid electric battery.

450. FCA also pervasively represented that plug-in hybrid-electric vehicles like the Defective Vehicles have significant environmental advantages over conventional vehicles with internal combustion engines. While operating in electric mode, the Defective Vehicles do not produce any of the noxious tailpipe emissions (such as nitrogen oxides and other smog-forming pollutants that are harmful to human health, and greenhouse gases, such as carbon dioxide and methane) that vehicles with internal combustion engines produce.

451. FCA knew that one of its largest customer bases are outdoor enthusiasts, who are often invested in issues such as climate change and environmental protection. It explicitly sought to exploit these consumer desires for a greener vehicle in their marketing. As explained by an FCA marketing executive: "With Jeep, you have the DNA of adventure and freedom, meaning that our customer already is in a relationship with the planet. . . . But some are maybe 'cheating' in the sense that they don't want to think about the fact that internal-combustion vehicles pollute. Some are in an open relationship with the planet but like combustion cars. And some are in true love with the planet and nature, and these are the consumers we want to start with" in promoting the Wrangler 4xe.

452. FCA also announced the Wrangler 4xe with a broadly disseminated advertisement narrated by Carl Sagan, a noted science educator and climate change activist. It concluded by showing the 4xe climbing a mountain and describing it as "the first-ever electric Wrangler."

453. In addition to embracing the environmental benefits of reduced gas consumption, Jeep also pervasively advertised the plug-in hybrid-electric design as a performance enhancer. When working together, the hybrid and electric power sources are supposed to provide more power and torque than Jeeps with traditional internal combustion engines, giving the Defective Vehicles faster acceleration and better performance.

454. For example, FCA advertised that the 2021 Jeep Wrangler output was capable of 470 pound-feet (lb.-ft.) of torque at 3,000 revolutions per minute (rpm) and 375 horsepower (hp) at 5,250 revolutions per minute, all while achieving 49 MPGe. By comparison, the lower-cost, gas-powered 2021 Jeep Wrangler with a 2.0 liter turbocharged four-cylinder gas engine could only put out a relatively meager 295 lb.-ft. of torque and 270 hp, with a combined city and highway gas mileage of 21 mpg.

455. FCA similarly touted the Jeep Grand Cherokee 4xe's performance and range numbers. At release, FCA represented that: "Overall, the 4xe system delivers 375 horsepower (280 kW) and 470 lb.-ft. (637 Nm) of torque. The Grand Cherokee 4xe, targeting an estimated 25 miles (40 km) of all-electric range, returns an estimated 57 MPGe and has an estimated total range of more than 440 miles (708 km)." FCA reassured consumers, "Don't let the near-silence of all-electric operation fool you—the legendary capabilities of Grand Cherokee still roar beneath this hood."

456. FCA also represented that the Grand Cherokee 4xe was all of what its gas-powered predecessor was and more because it was "designed and engineered to deliver even more of what

has made the Grand Cherokee a true global icon in the premium SUV segment, including legendary Jeep 4x4 capability, class-leading space and versatility and advanced safety features."

457. In introducing the Defective Vehicles, Christian Meunier, the then-Global President of the Jeep Brand, stated: "Our Jeep 4xe vehicles will be the most efficient, responsible and capable that the brand has ever created." FCA's pervasive marketing messaging for the Defective Vehicles effectively conveyed to consumers that they could have the best of all worlds—an adventurous 4x4 vehicle that was also emissions friendly and technology driven. Or, as FCA puts it: "Yes, you can have both."

458. The notion that the Defective Vehicles represented the best of all worlds was repeated in literature directed at potential buyers. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe states that the vehicle includes a "17-kwh Battery" and "is a shining example of hybrid innovation, handing you tomorrow's progressive technology, today," while also providing "the rugged, open-air freedom and legendary capability that Jeep Wrangler is revered for, the world over."

459. In addition to highlighting the off-road capabilities of the Jeep Wrangler 4xe, FCA also pervasively marketed the vehicle as fit for city driving, especially in all-electric mode. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe highlighted how the driver could choose between different modes of the hybrid drivetrain under the banner of "POWER x2," including an electric-only mode and an "E-SAVE" mode for "low-emission zones in cities."

460. FCA published similar messaging and advertising about the Grand Cherokee 4xe, which likewise features a 17-kwh HV Battery and dual electric motor setup like the Wrangler 4xe. FCA again advanced the notion that the Jeep Grand Cherokee 4xe, like the Wrangler 4xe before it, was the best of all worlds.

461. FCA has continually marketed the Defective Vehicles to gas-conscious consumers by making representations about the efficiency of both vehicles compared with their gas-powered equivalents. This includes, among other things, claiming that the Jeep Grand Cherokee 4xe "has the lowest estimated annual fuel cost of any Grand Cherokee ever," and that by buying the vehicle, they could bid "goodbye to the gas light."

462. FCA also repeatedly emphasized in its marketing and other pervasive statements the performance capabilities of the Jeep Wrangler 4xe in all-electric mode. In 2021, FCA announced plans to install Jeep-branded EV charging stations at popular off-road trailheads, including in Moab, Utah; Big Bear, California; and the Rubicon Trail in Pollock Pines—the namesake of one of the 4xe trim levels. Alongside this announcement, FCA touted that, "[w]ith 49 MPGe and 21 miles of all-electric range, the Jeep Wrangler 4xe can conquer even the toughest trails with zero emissions."

463. Notably, the advertised 49 eMPG is only achievable in all-electric mode. Without the ability to charge the vehicle, the 2023 Jeep Wrangler 4xe can achieve only 20 MPG in hybrid mode and the Grand Cherokee only 23 MPG in hybrid mode. Thus, the all-electric mode and convenience of charging at home are central to the value proposition of the Defective Vehicles. To that end, FCA highlighted the convenience of charging inside or near the home. FCA included a 25-foot 110v charger in the purchase of every 4xe vehicle. The relatively limited range of the cord implied that the vehicle was safe to charge within or near the owner's home. FCA also impliedly represented to each consumer that frequent charging was safe to do over and over, by stating in the manual that "[l]ithium-ion batteries can be recharged and discharged thousands of times."

464. FCA portrayed the Defective Vehicles as plug-in hybrid SUVs capable of running off either gasoline or electricity. The Vehicles "pair a traditional gas engine with … incredible electric motor performance," providing drivers with the option to operate their vehicles using only the electric motor, only the gasoline internal combustion engine, or as a hybrid. "Electric mode" is touted as allowing for "nearly zero tailpipe emissions up to highway speeds," and FCA boasts that the Wrangler 4xe "can run on this mode for a distance of up to 21 total miles on a full charge."

465. The purported benefits of the plug-in hybrid-electric design came at a hefty premium to consumers: the Jeep Wrangler and Grand Cherokee 4xe models cost thousands of dollars more than similarly equipped Jeep Wranglers and Grand Cherokees with conventional, non-hybrid internal combustion engines. And while FCA highlighted the electric battery features to justify this premium cost, FCA's marketing never disclosed to consumers that the Defective Vehicles were equipped with dangerous batteries susceptible to fire, even when the vehicle is turned off and not charging. Nor did FCA's marketing disclose to consumers that they would not be able to charge their vehicles or park them indoors due to the Defective Battery and resulting fire risk.

466. FCA also touted the array of safety features in the Defective Vehicles. For example, the vehicle brochure for the 2022 Jeep Wrangler 4xe highlighted its "advanced safety & security systems" and states, "when it comes to your well-being on the road Jeep Wrangler is ready and willing to stand as a constant guardian." FCA's marketing materials repeatedly emphasized the vehicles' safety, durability, and reliability, evidencing the materiality of these features to buyers. The brochures for the Defective Vehicles prominently advertised their advanced safety features: They also boasted of the vehicles' superior quality and workmanship. However, FCA never disclosed the existence of the Battery Defect.

467. Without the ability to charge the Defective Vehicles, consumers cannot make use of the much-advertised "all-electric" and "e-save" modes. The only practically available mode without plug-in charging capability is "hybrid," which is actually less fuel efficient than the gas-powered 4xe. As noted in Car and Driver, "[t]o get the full fuel-economy benefit [of the 2021 Wrangler 4xe], you'll have to stay close to home and plug in often. Once the battery has been depleted, the 4xe actually gets worse fuel economy than a Wrangler powered by the turbo four with none of the plug-in-hybrid hardware (20 versus 22 mpg combined). Blame the extra 800 pounds that the 4xe carries wherever it goes."

468. After extensively advertising the Defective Vehicles as a fuel-efficient, environmentally-friendly alternative since launch, the Wrangler 4xe -- weighed down by its underutilized electric motors and battery -- is actually slightly less fuel efficient than its lighter, gas-powered cousin. The Grand Cherokee 4xe with an unutilized HV Battery suffers from the same issues. The promise of FCA's various advertisements was thereby left unrealized. Certainly, FCA never disclosed in these numerous commercials or on its website that the Defective Vehicles would consume more fuel (or about the same amount of fuel) than its significantly less expensive gas-powered equivalent if the Defective Vehicles' hybrid and electric features could not be used as intended. By depriving Plaintiffs of their ability to charge their vehicles frequently and conveniently, FCA deprived them of a major value-proposition for the Defective Vehicles: less fuel consumption.

469. FCA also described the Wrangler 4xe as "the most capable, technically advanced and eco-friendly Wrangler ever." The Wrangler 4xe boasted "375 horsepower, an EPA fuel economy of 49 MPGe with the battery charged, and 21 miles of guilt-free electric driving before the gas engine kicks on" and promised "to combine contradictory attributes—power and

efficiency—into a single product that would have been unthinkable just 10 years ago." FCA prominently displays the Jeep Wrangler 4xe's 21-mile all-electric range throughout its website. As a result of this 21-mile electric driving range, FCA claimed that users would have the opportunity to "get around town solely on electric power. The Jeep Wrangler 4xe's product page states that its default setting is to run in Hybrid mode, meaning that it consumes electric power first until it runs out of charge, and then uses its gasoline engine. The Jeep Wrangler 4xe's product page also states that the Vehicle can run in Electric Mode, off of battery power alone, "[w]hen the battery has more than a 1% charge," and is capable of running in this mode "for up to 21 miles."

470. Like other hybrid and plug-in hybrid offerings, the Jeep Wrangler 4xe has both a gasoline engine and electric motors to enable gasoline-only, battery only—or a combination of the two—driving. In its promotional materials, FCA stated it had "logged over 1.4 million miles of real world on-road and off-road validation in all the corners of the world to make sure it's ready. We want to make sure this 'do anything' Wrangler does everything we promised."

471. After the success of the Jeep Wrangler 4xe, FCA introduced the Jeep Grand Cherokee 4xe for the 2022 model year. FCA describes the Grand Cherokee 4xe as "[u]ncompromising, sophisticated and remarkably capable[.]" The 2022 and 2023 Jeep Grand Cherokee 4xe "uses the same plug-inhybrid powertrain as the Wrangler [4xe]," including the same 400-volt, 17-kWh EV battery. In addition, as with the Wrangler 4xe, "[t]he battery pack system includes a dedicated heating and cooling circuit to keep the battery at its optimum temperature for best performance." The Grand Cherokee 4xe also features the same three driving modes as the Wrangler 4xe—Hybrid, Electric, and Esave—which provide the same functionality as its Wrangler 4xe counterpart. FCA's website emphasizes that the Grand Cherokee 4xe can achieve up to 25 miles of "pure EV driving" that helps Grand Cherokee 4xe owners "handle daily commutes."

472. As part of its ad campaigns, FCA put forth, and continues to put forth, advertisements showcasing the Defective Vehicles' ability to function in cold weather. The advertisements for the 4xe Vehicles go so far as to emphasize their durability in winter conditions, with ads showing the Vehicles on snowy roads or carrying ski and snowboard equipment. At no point did FCA inform the public that the ability to use the Defective Vehicle's all-electric mode would be compromised when the vehicles are driven in cold weather.

473. While FCA highlighted the all-electric range of the Vehicles in order to justify this premium cost, FCA's marketing never disclosed to consumers that the FORM Defect could render electric-only or electric assisted propulsion unavailable for long periods in cold weather that is typically found in Pennsylvania in the winter months and could interfere with the Vehicles' acceleration. In addition to concealing the FORM Defect, FCA actively mispresented the attributes and capabilities of the Vehicles by claiming, among other things, that the vehicles had been thoroughly tested.

474. Once the FORM Defect triggers, customers report having almost no access to electric-only or electric assisted vehicle operation for days, weeks, or months at a time, particularly, but not exclusively, during colder temperatures. The FORM Defect also interferes with the Vehicles' acceleration. The FORM Defect eliminates the benefits of the Vehicles' purportedly unique plug-in hybrid operations and creates a serious safety hazard. Plaintiffs paid a significant premium for the 4xe plug-in hybrid vehicles over the internal combustion-only versions of the same models, and therefore overpaid at the time of purchase for a feature that is not usable as represented. Had Plaintiffs known of the FORM Defect, they would not have purchased the "hybrid" Vehicles or would have paid considerably less for them.

**The Vehicles are unreasonably dangerous due to the Battery Defect**

475. Lithium-ion batteries, such as the Defective Batteries used in the Defective Vehicles, are used in most electric vehicles because of their "high power-to-weight ratio, high energy efficiency, good high-temperature performance, and low self-discharge." However, these batteries also have a well-documented history of fire issues. Safety concerns related to unexpected fires have been well documented, including a battery fire that happened weeks after the crash test of a Chevy Volt in 2011 and several Tesla Model S vehicles that suddenly caught fire while parked, and are known to FCA. Unfortunately, FCA ignored safety concerns in order to market the Vehicle's range, despite warnings published in October 2017 by the National Highway Traffic Safety Administration ("NHTSA") that overcharging lithium-ion batteries can result in one of several exothermic reactions that have the potential to initiate thermal runaway resulting in a spontaneous ignition.

476. Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells." Each cell contains the basic functional components of a battery: a positive electrode, a negative electrode, and an electrolyte.

477. The lithium-ion batteries in the Defective Vehicles were produced by Samsung SDI. Samsung SDI also manufactured the cells contained in batteries that allegedly caused fires in certain BMW and Ford models that have been recalled and subject to litigation. Those Ford and BMW recalls occurred in 2020, and upon information and belief, were caused by similar defective attributes as present here. According to BMW, the fires that led to recall of their PHEVs were caused by "thermal events" in the Samsung batteries.

478. As set forth below, FCA knew of the risk from the Defective Batteries from various sources, including: the well-documented risks of runaway propagation in lithium-ion batteries;

NHTSA warnings of safety risks for lithium-ion batteries; the well-known risks of violent combustion from the NMC batteries used in the Defective Vehicles; the rigorous pre-launch testing FCA must have done on the Defective Vehicles' HV Battery and hybrid propulsion system; consumer complaints lodged with NHTSA, FCA, and publicized online; and similar battery fire issues in other hybrid electric vehicles, including FCA's Chrysler Pacifica PHEVs, and BMW and Ford-manufactured vehicles that use Samsung batteries for electric propulsion. Through this accumulated knowledge, FCA was aware of the serious danger of the Defective Batteries by the time it released the Defective Vehicles into the market, and certainly well before it issued its November 2023 recall.

479. The dangers inherent in lithium-ion electric car batteries were well-known to FCA before FCA sold the first Jeep PHEV. An October 2017 NHTSA Paper titled Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles explained:

- Li-ion battery technology is in the development stage and is not yet settled.
- As battery technology matures, the safety risks may increase as manufacturers attempt to obtain greater performance from existing chemistries and adopt new chemistries with less field experience. Increasing the bounds of performance implies operating the battery cells closer to limits where damage initiation and growth, leading to failure, can occur.
- The investigation conducted here demonstrates that there are numerous external events or processes in the life of a vehicle that could contribute to damage and failure of a Li-ion battery.
- Exothermic reactions and/or internal electrical shorts may be triggered by manufacturing defects . . . . If allowed to continue, these reactions or shorts can create conditions for self-heating within the cell; which grow to become uncontrolled increases in temperature and pressure (thermal runaway); and potentially end in venting or catastrophic failure of the cell.
- The assessment conducted here suggests that codes and standards for Li-ion battery vehicle systems are in their early development stages and immature at this time. The assessment suggests there are gaps and risks inherent in new and rapidly evolving technology including:

- Immature design and manufacturing standards;
- Immature safety systems integration requirements;
- Immature quality control requirements;
- Immature battery life cycle durability requirements.
- The results of this investigation show that Li-ion battery technology is a rapidly evolving technology field that is far from settled.
- The risks associated with Li-ion battery systems derive fundamentally from the novelty of the technology and limited long-term experience base with its safety performance.
- The ability to store and deliver substantial energy onboard a vehicle also implies that substantial energy can be released, with corresponding hazards, in the case of failure. In this case, the energy is stored electrochemically in batteries, rather than chemically as a fuel. While systems safety engineering can achieve levels of safety with Li-ion technology comparable to that of conventional fuels, the automotive industry does not have decades of experience with it and the same understanding that it has concerning conventional and alternative fuels. Nor is there a directly comparable technology that can provide a strong experience base for development of safety requirements.

https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf

480. A meta-review of lithium-ion battery ("LIB") fire safety, in an article published in the Journal of the Electrochemical Society, similarly stated:

- Although great success has been made on LIB commercialization, safety concerns have emerged because of unexpected fires. Some LIBs can display a tendency to ignite under abuse conditions and initiate fires or release toxic gases, thus creating a hazard. Moreover, as LIB technology moves to larger scales, from single cells to modules and packs, assuring their safety is an issue of growing severity and stakes. Exceeding the window of conditions in which LIBs operate safely can trigger thermal runaway (TR) and lead to fires.
- The temperature of the LIB reaches a critical value such that the reaction rate of an exothermic reaction increases the temperature, which in turn leads to further acceleration of the reaction rate. This positive feedback of temperature increase is a sign of ignition and creates the fire hazards. Once a cell fails, the large amount of heat generated could trigger the thermal runaway of adjacent cells, contributing to

fire propagation. Fires on the module and pack scales can release large amounts of heat and toxic gases and are difficult to suppress.

- Internal cell defects and internal faults that develop inside individual cells over time, causing the initiation of thermal runaway, are a major concern for all industries which demand methods and tools to reliably identify them.

- Another important concern that most industries agree on is the importance of the scale at which the safety testing takes place. The tests performed at component level might not be comparable to the tests performed at system level. Most of the research on safety is performed on cell or small modules, and similar data at pack and system is scarce.

- LIB failure can occur very rapidly after a cell is damaged, or slowly over a long period of time, causing delayed failure long after the damage is initiated. The time in between is usually referred to as the incubation period which can last from several hours to years, depending on the cause and failure mechanism. However, when a critical point is reached, usually governed by the balance between heat generation and heat dissipation from the cell and battery pack to the environment, the failure happens very fast.

https://iopscience.iop.org/article/10.1149/1945-7111/aba8b9

481. Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells." Each cell contains the basic functional components of a battery: a positive electrode, a negative electrode, and an electrolyte. In order to develop a battery that would deliver the advertised range, FCA developed a battery with "new cell design and chemistry." The battery contains "nickel-rich lithium-ion chemistry" that purportedly provides "improved thermal performance over other chemistries" and requires a "smaller active cooling system for more efficient packaging."

482. According to NHTSA, proper management of the electrical loads among cells in a pack helps maintain overall charge and discharge performance within an acceptable range. Because temperature is a key indicator of cell electrical performance (e.g., hotter cells may discharge or charge more quickly than colder cells), thermal management strategies must be

integrated into the battery system design to monitor charging and discharging events and mitigate potentially problematic conditions that can create a risk of fires like those at issue here.

483. Most electric and hybrid-electric vehicles, like the Defective Vehicles, use lithium-ion batteries because of their "high power-to-weight ratios, high energy efficiency, good high-temperature performance, and low self-discharge. However, lithium-ion batteries carry well-documented risks of combustion if they are improperly used by an auto manufacturer or placed in vehicles that are defectively designed or manufactured or placed in vehicles that are defectively designed or manufactured. Safety concerns related to unexpected fires connected with lithium-ion batteries are well-documented and were known to FCA at the time it designed, manufactured, and sold the Defective Vehicles. Even before NHTSA released its comprehensive report on lithium-ion battery safety issues in 2017, many scientific and engineering articles discussed the thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.

484. The HV Battery Systems placed in the Defective Vehicles by FCA are nickel-manganese-cobalt compositions. Importantly, "Ni[ckel]-rich NMC cathode materials are known to be susceptible to certain safety issues, such as thermal runaway and the risk of triggering battery fires." Thus, especially for NMC battery systems, it is imperative to set appropriate controls regarding maximum and minimum state of charge, maximum and minimum cell and/or overall voltage, appropriate current limitations, as well as robust cell temperature monitoring features.

485. In particular, NMC batteries are particularly susceptible to "lithium plating," a dangerous phenomenon that increases the thermal runaway risks posed by lithium-ion batteries. Lithium plating occurs when metallic lithium deposits on the anode surface form tree-like structures called "dendrites." Those tree-like structures can then penetrate and damage the separator into the cathode and cause short circuiting, which in turn sparks a battery fire.

486. Dendrite formation—a form of internal physical damage to the battery—can occur as a result of repeated use and/or charging of the battery or its cells outside of manufacturer specifications. The effect of dendrite formation that leads to increased risk of short-circuit and thermal runaway is therefore cumulative; it increases as the battery or its cells are repeatedly subjected to improper use and/or charging conditions.

487. Significantly, the documented fires in the Defective Vehicles do not appear to be the result of external damage or misuse by the consumer. Upon information and belief, all reported fires to date have resulted from internal battery failure while the cars are parked and turned off, which points to either improper programming or internal issues within the battery.

488. Despite the known fire risk of the particular composition of these HV Batteries, FCA's design of the Jeep Wrangler 4xe and the Jeep Grand Cherokee 4xe placed the HV Battery directly inside the passenger compartment of the vehicle underneath the rear seat bench. The location of the battery within the cabin means that the combustion of the battery and outgassing of toxic chemicals occurs in the cabin of the Defective Vehicles, which at least one firefighting expert has described as a "terrible idea in my mind."

489. Just as important as the design and safety features used in a lithium- ion battery pack is rigorous pre-launch testing. The use of better safety systems and more rigorous testing would have prevented the reported battery fire incidents in the Defective Vehicles.

490. The dilemma facing electric and plug-in hybrid electric vehicles is that incorporating adequate safety measures is not only expensive, but also "is likely to reduce the vehicle's range because any protective materials means less space for the electricity-storing cells." On information and belief, FCA skimped on available protection measures in order to promote the high electric mode range and overall range, speed of charging, and other desirable features of the

Defective Vehicles—all to the benefit of FCA's bottom line and to the detriment of owners and lessees of the Defective Vehicles.

**The Vehicles are unreasonably dangerous due to the FORM Defect**

491. The Vehicles are also unreasonably dangerous due to the FORM Defect. When the Vehicles enter and remain in FORM, and the electric propulsion system is unavailable, the Vehicles' acceleration is compromised. This problem makes merging difficult and dangerous, especially when entering a highway. The danger is exacerbated because the Plaintiffs cannot determine when their Vehicles will enter FORM how long they will stay in FORM and what conditions will allow them to exit FORM. As a result, the acceleration of Plaintiffs' Vehicles is erratic and unpredictable, creating a serious safety risk.

**FCA had advanced notice of the defects in the Defective Vehicles**

**A. FCA had advanced notice of the Battery Defect.**

492. FCA accumulated knowledge of the automotive industry's issues with the HV Battery packs it placed in the Defective Vehicles. Both the Wrangler 4xe and the Grand Cherokee 4xe utilize 17 kwh high-voltage lithium-ion battery packs, which were manufactured by Samsung SDI America Inc. ("Samsung").

493. Samsung has a history of issues with its high-voltage EV batteries, of which FCA has had notice of since at least 2020. In August 2020, for instance, Ford recalled its Kuga PHEV due to a battery defect and owners were told not to charge the battery. The battery manufacturer was Samsung. Similarly, BMW recalled over 26,000 of its vehicles due to defective batteries whereby "the battery production process allowed impurities to enter the cells." And around 2022, Samsung recalled more than 1,000 of its EV batteries (including in FCA vehicles) because of poor manufacturing quality.

494. FCA was also on notice of the Battery Defect because it accumulated knowledge of a similar defect in another FCA plug-in hybrid vehicle: the 2017-2018 Chrysler Pacifica plug-in hybrid minivan. Even before the first Jeep PHEV rolled off the lot, FCA began receiving reports of fires related to the HV battery system in Chrysler Pacifica Plug-in Hybrid, including a vehicle fire on April 23, 2019. Another occurred on June 15, 2019, where a Chrysler Pacifica exploded in front of a house while plugged in. The design of the particular parts of the Chrysler Pacifica plug-in that are related to the HV battery are similar to the analogous components in the Defective Vehicles. On February 11, 2022, FCA issued a recall for more than 16,700 of its 2017-2018 Chrysler Pacifica plug-in hybrids due to rising reports of fires in those vehicles. It stated that, "[a] vehicle may experience a fire, even with the ignition in the 'OFF' mode," much like the Defective Vehicles.

495. FCA's knowledge of the Chrysler Pacifica fires dates as far back as 2019, so the associated battery issues in those vehicles predated its release of the Defective Vehicles in 2020 and any sale of the Defective Vehicles. FCA manufactured both of these plug-in hybrid systems and was therefore on notice that similar HV Battery parts were likely to cause fires, especially if they were programmed to be used inconsistently with industry standard safety guidelines.

496. FCA had exclusive and superior knowledge of the battery defects and Plaintiffs could not reasonably discover the defects through reasonable diligence. Among other sources, FCA knew or should have known of the widespread battery defect through widespread industry knowledge of the dangers inherent in lithium-ion electric car batteries, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early reports of loss of propulsion in Jeep vehicles caused by low battery voltage, reports of fires caused by defective Jeep batteries, consumer complaints made to FCA's network of dealers

and directly to FCA, aggregate warranty data compiled from FCA's network of dealers, testing conducted by FCA in response to consumer complaints, repair order and parts data received by FCA from FCA's network of dealers, recall notices, customer satisfaction notices ("CSNs"), technical service bulletins ("TSBs"), internal investigations and failure analyses, software updates, diagnostic software update vehicle data and NHTSA reports. Despite such knowledge, FCA suppressed the true facts in order to sell additional vehicles, avoid the cost of repairs, replacements or recalls, limit warranty claims and avoid bad press.

**B. FCA had advanced notice of the FORM Defect.**

497. FCA also had advanced notice of the FORM Defect through widespread pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, consumer complaints made to FCA's network of dealers and directly to FCA, aggregate warranty data compiled from FCA's network of dealers, testing conducted by FCA in response to consumer complaints, repair order and parts data received by FCA from FCA's network of dealers, recall notices, customer satisfaction notices ("CSNs"), technical service bulletins ("TSBs"), internal investigations and failure analyses, software updates, diagnostic software update vehicle data and NHTSA reports.

498. FCA stated in the 2021 manuals for the Defective Vehicles that the vehicles will enter FORM to maintain engine lubrication properties "if the system detects a stale fuel or aged oil condition after a long period without combustion engine operation." When this message appears, owners are unable to access electric-only or electric-assisted propulsion to drive their vehicles.

499. But the truth is that the defective nature of the Vehicles results in FORM manifesting far more often and for longer than is reasonable. Indeed, Class Vehicles owners report

having little to no access to electric-only or electric-assisted operation for months on end. As a result, the Defect frequently deprives the user of access to electric-only or electric-assisted driving.

500. In January 2022, FCA issued Technical Service Bulletins ("TSBs") relating to the FORM Defect. One TSB indicated that FORM cycles may be extended due to an issue with the PCM software, and provides for reprogramming that module. However, another TSB stated that the FORM cycles were operating as designed.

501. The 2021 Jeep Wrangler 4xe manual stated, prior to its revision after the 2021 Jeep Wrangler 4xe went on sale that: "[T]he engine may run for a period of up to 20 minutes when fully warm whenever the vehicle is operational (no electric only operation). If the vehicle is shut down before conditions to exit the refresh mode have been satisfied, the engine may run for additional time on subsequent trips." However, user experiences and FCA's own testing put FCA on notice that the Vehicles cold remain in FORM mode for up to 2.5 hours. User experiences and FCA's own testing also put FCA on notice that the FORM Defect was much more frequent and pronounced in cold weather environments. FCA concealed the true extent and nature of the FORM Defect from the public despite its advanced knowledge of the problem.

502. Even when FCA updated the owners' manuals for the Defective Vehicles, it continued to conceal the nature, extent and duration of the FORM Defect. Among other things, FCA failed to disclose the specific circumstances under which vehicles would enter FORM, the frequency with which Vehicle would enter FORM, the duration of time the Vehicles would remain in FORM or the circumstances under which the Vehicles would exit FORM.

**<u>FCA had a duty to disclose the defects</u>**

503. FCA had a duty to disclose the Defective Batteries and the FORM Defect as well as the safety risk caused by such defects because:

a. FCA was in a superior position to know the true state of facts about the Defective Vehicles, the Battery Defect and the FORM Defect and had exclusive knowledge of the defects based on sources not available to consumers;

b. Plaintiffs could not reasonably have been expected to learn or discover that their Vehicles were defective or had the Battery Defect or the FORM Defect;

c. FCA actively concealed the defects at issue, which were material facts of which it had exclusive knowledge;

d. FCA knew that Plaintiffs were not aware of the defects, that they could not reasonably have been expected to learn about or discover that their Vehicles were defective or had the Battery Defect or the FORM Defect, and that they would not have purchased the Vehicles, or would have paid substantially less for the Vehicles, had they been aware of the defects;

e. The existence of the defects was a material fact, pertaining to vehicle safety, that a reasonable consumer would consider highly material in determining whether to purchase or lease the subject vehicles and at what price; and

f. FCA made partial disclosures about the vehicles' range, the batteries' capabilities, the vehicles' safety and the vehicles' quality that were misleading without full disclosure of the defects.

Despite its duty to disclose, FCA actively concealed and failed to disclose the Battery Defect and FORM Defect.

**As a result of the Battery Defect, fires began to occur after the Vehicles were launched**

504. After FCA released the Defective Vehicles into the market, owners and lessees began complaining that their Defective Vehicles suddenly caught fire. According to FCA, between

April and November 2023, at least eight Jeep Wrangler 4xes caught fire all while parked and turned off. According to FCA's recent 2024 Recall, an additional thirteen incidents occurred in Jeep Wrangler and Grand Cherokee 4xe's between April and July 2024. Numerous other fires were recorded in the NHTSA complaint database.

505. In addition to these incidents, FCA also had notice of the Defective Batteries through its buyback acquisition of Defective Vehicles and subsequent investigation. According to its 2023 Recall Part 573 Safety Recall Report, FCA requested buybacks of seven vehicles and received buybacks of two of those vehicles and disassembled the HV battery packs.

506. In addition to these earlier inspections, according to its Part 573 Recall Report for the more recent 2024 Recall, "FCA conducted further analysis of the battery packs from" certain Wrangler 4xe and/or Grand Cherokee 4xe Defective Vehicles that caught fire between April and July 2024.

507. The Defective Vehicles also suffered electrical fires from the FORM Defect after they were sold. NHTSA complaints relating to underhood fires were submitted to NHTSA as early as March 2021. Other similar fires were reported to NHTSA in September 2021, November 2021, May 2023, August 2023, January 2024, February 2024, March 2024 and January 2025.

508. By April 2023, FCA had begun investigating underhood fires originating in the area of the FORM electrical connector. But it was not until June 2026 that FCA first issued a recall relating to the FORM Defect. That same month, NHTSA announced that it was aware of 51 fires and one injury likely caused by the FORM Defect.

509. All vehicle manufacturers, including FCA, routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, FCA has knowledge of all NHTSA complaints filed concerning

the vehicles it manufactures, including the Defective Vehicles. See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

**Plaintiffs unknowingly purchased Defective Vehicles**

510. Plaintiffs made the decision to purchase their Vehicles after considering FCA's representations about the Vehicle, including the reported range and mileage. Plaintiffs chose their Vehicles based on the Vehicles' represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the Vehicle, Plaintiffs relied on FCA's warranty that the Vehicles would be free of defects in materials and workmanship, including in the Vehicle's electric battery and FORM, at the time of purchase.

511. Prior to Plaintiffs' purchase of their vehicles, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicles. Plaintiffs reasonably expected that their Vehicles, including their electric batteries would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that their Vehicles would be capable of being charged without compromising their safety or exposing the vehicle to a risk of fire. Plaintiffs reasonably expected that their Vehicles would reliably operate in electric-only mode in all conditions and would be able to consistently achieve the advertised electric-only range. And Plaintiffs reasonably expected that their Vehicles would provide adequate and reliable acceleration.

512. The Vehicles had less than 100,000 miles and was still covered by the express warranty when the Vehicles were acquired by Plaintiffs and the Vehicles were defective at that time. Moreover, the Vehicles had less than 100,000 miles and were still covered by the express

warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect and FORM Defect within a reasonable time.

513. As a result of the Battery Defect and FORM Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defective Battery and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicles. Had Plaintiffs known that the Vehicles presented a risk of a catastrophic fire and suffered from the FORM Defect, they would not have purchased the Vehicles or would have paid substantially less for them.

514. At the time of the purchase, Plaintiffs were unaware that their Vehicles had the Battery Defect and FORM Defect. Had Plaintiffs known the true facts about their Vehicles, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for them. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisitions and suffered incidental, consequential and actual damages after the Vehicle's acquisitions.

**FCA issued a series of ineffective recalls of the Defective Vehicles as a result of the Battery Defect**

515. Despite FCA's actual and/or constructive knowledge of the serious risk of explosion and fire in the Defective Vehicles, it did nothing to remedy the problem or even warn consumers until its November 2023 recall.

516. According to the 2023 Recall Part 573 Recall Report that FCA sent to NHTSA on November 22, 2023, FCA's Technical Safety and Regulatory Compliance organization began investigating fire risk from the HV battery pack after receiving numerous reports of fires. By October 2023, FCA had conducted "two vehicle buybacks and . . . disassembled the HV battery packs. The modules and cells are undergoing additional analysis." FCA still has not disclosed the

results of any such analysis. Finally, on November 22, 2023, FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall" of the Defective Vehicles. The 2023 Recall, however, did not provide any fix for the Battery Defect. Four months later, FCA announced an attempted recall procedure in March 2024. But even after those months of delay, FCA admitted that it still had not identified the root cause of the Battery Defect.

517. Nevertheless, FCA self-servingly predicted in its communications with dealers that, "Very few vehicles [an estimated one percent] are expected to require HV battery replacement." FCA's rosy prediction for its 2023 Recall was off the mark. Defective Vehicles failed the recall procedure in unexpectedly high numbers. One online poll on a Jeep 4xe forum found that nearly half of respondents needed a replacement HV battery, with all but one still waiting on their battery at the time they responded to the poll.

518. According to FCA's final Quarterly Report to NHTSA regarding its 2023 Recall, as of July 26, 2024, roughly half of a "recall population of 32,125" vehicles actually received recall service. Unsurprisingly, given the large number of vehicles that ultimately failed recall service, consumers have reported waiting for months on end for their replacement HV Battery on various Jeep forums.

519. FCA Recall B9A was announced in November 2023. It applied to 2021-2023 Jeep Wrangler PHEVs. According to the recall notice, an internally failed HV battery could lead to a vehicle fire. Owners were instructed to refrain from charging their vehicles and to not park their vehicles near buildings, structures or other vehicles. At the time of the recall notice, the approved remedy, a software flash, was not available. The initial recall applied to approximately 32,000 vehicles.

520. In September 2024, FCA issued Recall 95B. The recall applied to 2020-2024 Jeep Wrangler PHEVs and 2022-2024 Jeep Grand Cherokee PHEVs. The new recall applied to subject vehicles even if they had already received the Recall B9A repair. According to FCA, the most likely root cause of the defective batteries in the Defective Vehicles was separator damage. At the time of the recall notice, the approved remedy, a software flash, was not available. The 2024 recall applied to approximately 154,000 vehicles.

521. In October 2025, FCA issued Recall 68C. The recall applied to 2020-2025 Jeep Wrangler PHEVs and 2022-2026 Jeep Grand Cherokee PHEVs. The new recall applied to subject vehicles even if they had already received the Recall B9A repair or the Recall 95B repair. At the time of the recall notice, the approved remedy, a software flash, was not available.

522. As FCA floundered in performing the various recalls, it continued to advise the Defective Vehicle owners and lessees "to refrain from recharging these vehicles and not to park them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed." These instructions left the Defective Vehicle owners with three choices: (i) follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline (and potentially degrading their HV Batteries further by not charging them as per FCA's use guidelines); (ii) ignore FCA's instructions and risk disaster; or (iii) sell the vehicles at a substantial loss as a result of FCA's conduct.

**FCA has failed to remedy the FORM Defect**

523. Despite its longstanding knowledge of the FORM defect, FCA has failed to act to notify all Vehicle owners of its omissions, remedy its misrepresentations regarding the FORM Defect or implement a recall to remedy or eliminate the FORM Defect. In fact, it appears that FCA

has only issued one TSB directly referencing the FORM Defect. Dated December 23, 2022, FCA's TSB only applies to 2022 Jeep Wrangler 4xe vehicles and is meant to address the following customer complaints: "Vehicle may not be able to enter electric mode driving while Fuel Oil Refresh Mode (FORM) is active[,]" and/or "FORM staying on too long." The TSB instructs dealer technicians to update the 2022 Jeep Wrangler 4xe's powertrain control module (PCM), the hybrid control processor (HCP), the auxiliary hybrid control processor (AHCP) also known as the Power Inverter Module (PIM), and the Transmission Control Module (TCM). On information and belief, application of these updates has proved ineffective in remedying or ameliorating the FORM Defect.

524. FCA later issued a Customer Satisfaction Notification directed toward certain 2023 Jeep Wrangler 4xe owners. The Customer Satisfaction Notification instructs 2023 Jeep Wrangler 4xe owners to visit a dealership because "[t]he full electric mode on your vehicle may not be available due to an incorrectly enabled engine maintenance mode designed to protect your engine from failure due to diluted oil." The notification makes no mention of FORM, the conditions that may trigger it, or how the stated solution will remedy the problem. Rather than reveal the true nature and extent of the FORM Defect or implement a recall to remedy it, FCA has continued to conceal the extent of the problem.

**FCA's Express and Implied Warranties**

525. Plaintiffs purchased their Vehicles from FCA's network of authorized dealers who were authorized sellers and distributors of the Defective Vehicles. Those dealers were and are FCA's authorized representatives for service and repair, including warranty repairs, of the subject vehicles. FCA intends for the dealers to sell its vehicles to consumers like Plaintiffs and the contracts between FCA and its authorized dealers, including the warranties, are made for the

express benefit of the ultimate purchasers of the subject vehicles and not for the dealers. As a result, consumers, not FCA's dealers, are the intended third-party beneficiaries of all express and implied warranties between FCA and its dealers relating to the subject vehicles and those warranties are designed solely for the benefit of the ultimate consumers of the subject vehicles.

526. When Plaintiffs' Vehicles were acquired by Plaintiffs, they were backed by FCA's New Vehicle Limited Warranty, which covered the Vehicles and warranted the Vehicle, including their batteries, to be free of defects in materials and workmanship at the time of purchase or lease. An implied warranty of merchantability also accompanied the sale and lease of the vehicles by operation of law under the UCC and Texas law.

527. Pursuant to the express and written New Vehicle Limited Warranty, FCA warranted Plaintiffs' Vehicles' to be free of defects in materials and workmanship and that repairs and other adjustments would be made for the benefit of Plaintiffs by authorized FCA dealers, without charge, to correct defects in materials or workmanship.

528. Pursuant to the implied warranty, FCA warranted the Vehicles were merchantable under both the UCC and Texas law Act. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without a risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

529. FCA does not sell vehicles directly to consumers such as Plaintiffs but rather only through its authorized FCA dealers. Plaintiffs acquired the Vehicles from authorized FCA dealers.

530. FCA also does not directly provide the repairs or other services called for under the terms of FCA's New Vehicle Limited Warranty. Instead, FCA uses its authorized FCA dealers to both provide the written New Vehicle Limited Warranty to consumers who purchase or lease FCA vehicles and to perform repairs or other services under the terms of FCA's New Vehicle Limited Warranty.

531. As intended and directed by FCA, FCA's written New Vehicle Limited Warranty was provided to Plaintiffs, the ultimate consumers, at the time they took delivery of the Vehicles and as part of the basis of the bargain. FCA's New Vehicle Limited Warranty contains the rights and obligations of both Plaintiffs and FCA and is a binding agreement between them. The sale of the Vehicle by FCA's authorized dealer, coupled with the issuance of FCA's express warranties, created a direct transactional relationship between FCA and Plaintiffs. Since FCA provided an express and written warranty to the ultimate consumer with the purchase or lease of the vehicle no further "privity of contract" is required to enforce the warranties.

532. When deciding to acquire the Vehicles, Plaintiffs were aware FCA warranted that its vehicles to be free of defects at the time of purchase or lease and during the warranty period. In purchasing the subject Vehicles, Plaintiffs relied on FCA's warranty that the Vehicles, including their electric batteries, would be free of defects at the time of purchase and during the warranty period.

533. Additionally and alternatively, Plaintiffs may enforce FCA's express New Vehicle Limited Warranty as well as the implied warranty of merchantability as an intended third-party beneficiary. FCA's written New Vehicle Limited Warranty and the implied warranty of merchantability were and are intended solely for the benefit of Plaintiff, the owner of the Vehicle. Plaintiffs were and are the intended third-party beneficiary of those warranties. The dealers from

whom they purchased the Vehicles were not intended to be the ultimate consumer of the subject Vehicles and had no rights under the warranty agreements applying to the Vehicles.

534. The express and implied warranties applicable to the subject Vehicles were intended for the benefit of the ultimate purchasers and owners of the vehicles. The applicable warranties are applicable to original or subsequent owners and are transferrable from owner to owner.

535. FCA's New Vehicle Limited Warranty is only intelligible if it is understood as being intended to benefit Plaintiffs, i.e. the persons who purchased the Vehicles and are the owners of the Vehicles. The dealers from whom Plaintiffs purchased the subject Vehicles were not intended to be the ultimate consumer of the subject Vehicles, were not the intended beneficiary of the express and implied warranties applying to the Vehicles and had no rights under the warranty agreements at issue. Rather, the warranty agreement was designed for and intended to benefit the ultimate consumers only.

## ARIZONA CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

536. Arizona Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

537. Arizona Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

538. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

539. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and Arizona Plaintiffs in fact purchased it wholly or primarily for personal use.

540. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

541. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Arizona law.

542. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

543. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Arizona Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Arizona Plaintiffs. Among other things, Arizona Plaintiffs had no

meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Arizona Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

544. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Arizona Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

545. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Arizona Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

546. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

547. As a result of said nonconformities, Arizona Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Arizona Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

548. Arizona Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Arizona Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Arizona Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

549. Arizona Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

550. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arizona at Ariz. Rev. Stat. § 47-2101 *et. seq.*

551. FCA is and was at all relevant times a "seller" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arizona at Ariz. Rev. Stat. § 47-2101 *et. seq.*

552. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers,

without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Arizona law.

553. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

554. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Arizona Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Arizona Plaintiffs. Among other things, Arizona Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Arizona Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

555. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Arizona Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

556. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Arizona Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

557. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

558. As a result of said nonconformities, Arizona Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Arizona Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

559. Arizona Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Arizona Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of

express warranties, Arizona Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

560. Arizona Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

561. Arizona Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

562. Arizona Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Arizona Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

563. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC") as adopted by Arizona at Ariz. Rev. Stat. § 47-2101 *et. seq.*

564. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ariz. Rev. Stat. § 47-2101 *et. seq.*

565. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arizona at Ariz. Rev. Stat. § 47-2314.

566. FCA provided Arizona Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable

quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

567. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

568. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

569. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles,

Arizona Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

570. Arizona Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Arizona Plaintiffs.

571. Arizona Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Arizona Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

572. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Arizona Plaintiffs

573. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

574. Arizona Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. Arizona Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

575. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

576. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC") as adopted by Arizona at Ariz. Rev. Stat. § 47-2101 *et. seq.*

577. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ariz. Rev. Stat. § 47-2101 *et. seq.*

578. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arizona at Ariz. Rev. Stat. § 47-2314.

579. FCA provided Arizona Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

580. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the

restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

581. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

582. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Arizona Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

583. Arizona Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Arizona Plaintiffs.

584. Arizona Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Arizona Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

585. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Arizona Plaintiffs

586. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

587. Arizona Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Arizona Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FIFTH CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

588. Arizona Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

589. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM

Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

590. Under Arizona law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

591. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

592. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Arizona Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

593. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Arizona Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

594. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Arizona Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

595. Arizona Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Arizona Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

596. As a result of FCA's omissions and concealments, Arizona Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

597. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Arizona Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

598. Arizona Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

599. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements

of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

600. Arizona Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Arizona Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

601. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Arizona Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION –**
**VIOLATION OF THE ARIZONA COMNSUMER FRAUD ACT**

602. Arizona Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

603. The Arizona Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

604. FCA and the Arizona Plaintiffs are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6)

605. The Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

606. The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A). FCA intentionally violated the Arizona CFA.

607. FCA violated the Arizona CFA as a result of its manufacture and sale of defective vehicles and its fraudulent omissions regarding the safety, reliability and electric range of the vehicles, which conduct had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects and by marketing the benefits and capabilities of the Defective Vehicles without disclosing the Defects, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

608. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in its business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including Arizona Plaintiffs, and imposed a serious safety risk on the public.

609. FCA knew that the Vehicles suffered from inherent defects, were defectively designed or manufactured, and were not suitable for their intended use of providing safe and reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of the Defective Vehicles, FCA failed to disclose and actively concealed the Defects as described above.

610. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through their advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

b. Representing that the Vehicles and their batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sale to Arizona Plaintiffs, FCA knew or had reason to know that the Vehicles and their batteries had inherent safety defects as described above, but FCA failed to disclose this material information to Arizona Plaintiffs

e. Failing to reveal material facts which misled Arizona Plaintiffs and which facts could not reasonably have been known by Arizona Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law.

FCA's violative practices were specifically designed to induce, and did in fact induce, Arizona Plaintiffs to purchase the Vehicles.

611. Arizona Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles and their batteries.

612. These violations were not due to a bona fide error. FCA engaged in the same unfair and deceptive acts or practices in connection with the sale or lease of numerous model years of Defective Vehicles.

613. As a direct and proximate result of FCA's unfair or deceptive acts or practices, Arizona Plaintiffs have suffered and will continue to suffer actual damages, including overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages. Had Arizona Plaintiffs known of the Defects in the Vehicles, they would not have acquired the Vehicles or would have paid substantially less for them.

614. As a result of the Defects in the Vehicles, Arizona Plaintiffs were harmed and suffered actual damages including overpayment at the time of acquisition, out of pocket costs, destruction of his home, loss of the Vehicles and various consequential damages.

615. FCA had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Arizona CFA in the course of its business.

616. FCA's violations present a continuing risk to the Arizona Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

617. The Arizona Plaintiffs hereby sue FCA for actual damages, including economic and non-economic damages in an amount to be determined at trial. The Arizona Plaintiffs also sue FCA for punitive damages because FCA engaged in aggravated and outrageous conduct with an evil mind. The Arizona Plaintiffs also sue FCA for attorneys' fees and costs and any other just and proper relief available under the Arizona CFA.

## ARKANSAS CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

618. Arkansas Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

619. Arkansas Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

620. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

621. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and Arkansas Plaintiffs in fact purchased it wholly or primarily for personal use.

622. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

623. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Arkansas law.

624. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited

Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

625. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Arkansas Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Arkansas Plaintiffs. Among other things, Arkansas Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Arkansas Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

626. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Arkansas Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

627. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Arkansas Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not

required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

628. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

629. As a result of said nonconformities, Arkansas Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Arkansas Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

630. Arkansas Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Arkansas Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Arkansas Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

631. Arkansas Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

632. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arkansas at Ark. Code Ann. § 4-2-101 *et. seq.*

633. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arkansas at Ark. Code Ann. § 4-2-101 *et. seq.*

634. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Arkansas law.

635. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

636. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty

limitations are unenforceable because FCA knowingly sold a defective product to Arkansas Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Arkansas Plaintiffs. Among other things, Arkansas Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Arkansas Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

637. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Arkansas Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

638. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Arkansas Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

639. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

640. As a result of said nonconformities, Arkansas Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Arkansas Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

641. Arkansas Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Arkansas Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Arkansas Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

642. Arkansas Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

643. Arkansas Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

644. Arkansas Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Arkansas Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

645. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arkansas at Ark. Code Ann. § 4-2-101 *et. seq.*

646. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arkansas at Ark. Code Ann. § 4-2-101 *et. seq.*

647. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arkansas at as adopted by Arkansas at Ark. Code Ann. § 4-2-314.

648. FCA provided Arkansas Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

649. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their

range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

650. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

651. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Arkansas Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

652. Arkansas Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Arkansas Plaintiffs.

653. Arkansas Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Arkansas Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

654. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Arkansas Plaintiffs

655. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

656. Arkansas Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. Arkansas Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

657. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

658. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arkansas at Ark. Code Ann. § 4-2-101 *et. seq.*

659. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arkansas at Ark. Code Ann. § 4-2-101 *et. seq.*

660. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arkansas at as adopted by Arkansas at Ark. Code Ann. § 4-2-314.

661. FCA provided Arkansas Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

662. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

663. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent

and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

664. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Arkansas Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

665. Arkansas Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Arkansas Plaintiffs.

666. Arkansas Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Arkansas Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

667. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Arkansas Plaintiffs

668. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

669. Arkansas Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Arkansas Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FIFTH CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

670. Arkansas Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

671. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

672. Under Arkansas law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and

conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

673. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

674. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Arkansas Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

675. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Arkansas Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

676. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Arkansas Plaintiffs to purchase

the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

677. Arkansas Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Arkansas Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

678. As a result of FCA's omissions and concealments, Arkansas Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

679. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Arkansas Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

680. Arkansas Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

681. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

682. Arkansas Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Arkansas Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

683. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Arkansas Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION -**
**VIOLATION OF THE ARKANSAS UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT**
**ARKANSAS STAT. § 45.50.471, *et seq.***

684. The Arkansas Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

685. The Arkansas Deceptive Trade Practices Act (Arkansas DTPA) prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to "[e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce, or trade." ARK. CODE. ANN. § 4-88-107(a)(10). The Arkansas DTPA also prohibits, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." ARK CODE. ANN. § 4-88-108. FCA's aforementioned conduct violated the Arkansas DTPA.

686. FCA and the Arkansas Plaintiffs are "persons" within the meaning of ARK. CODE. ANN. § 4-88-102(5).

687. FCA of the vehicles at issue constitutes "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

688. FCA violated the Arkansas DTPA as a result of its manufacture and sale of vehicles with the aforementioned Defects, which FCA failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of these vehicles, which had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and high-quality hybrid vehicles protected by FCA's warranty, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

689. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in FCA's business of manufacturing, distributing, and advertising the sale of the vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including the Arkansas Plaintiffs, and imposed a serious safety risk on the public.

690. FCA knew that the Vehicles and their electric batteries suffered from inherent defects, were defectively designed or manufactured, and were not suitable for their intended use of providing reliable electric and electric-assisted transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of vehicles, FCA failed to disclose and actively concealed the Defects in the Vehicles as described above.

691. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through its advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they

did not actually have;

b. Representing that the Vehicles and their electric batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sales or leases to the Arkansas Plaintiffs, FCA knew or had reason to know that the Vehicles had inherent and systemic Defects, as described in this Complaint, but FCA failed to disclose this material information to the Arkansas Plaintiffs;

e. Failing to reveal material facts which misled Arkansas Plaintiffs and which facts could not reasonably have been known by the Arkansas Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law;

h. Entering into a consumer transaction in which the Arkansas Plaintiffs purportedly waived a right, benefit, or immunity provided by law, without clearly stating the waiver and obtaining the Arkansas Plaintiffs' specific consent to the waiver.

FCA's violative practices were specifically designed to induce, and did in fact induce, the Arkansas Plaintiffs to purchase or lease their Vehicles.

692. The Arkansas Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their batteries.

693. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the Arkansas Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease, overpayment damages, loss of use of their vehicles, loss of resale value and other consequential damages. Had the Arkansas Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

694. The Arkansas Plaintiffs seek monetary relief against FCA in an amount to be determined at trial. The Arkansas Plaintiffs also seek punitive damages because FCA acted wantonly in causing the Arkansas Plaintiffs' injuries, or with such a conscious indifference to the consequences that malice may be inferred. The Arkansas Plaintiffs also seek attorneys' fees, costs, and any other just and proper relief available under the Arkansas DTPA.

## ILLINOIS CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

695. Illinois Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

696. Illinois Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

697. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

698. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and Illinois Plaintiffs in fact purchased it wholly or primarily for personal use.

699. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

700. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Illinois law.

701. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

702. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Illinois Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Illinois Plaintiffs. Among other things, Illinois Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Illinois Plaintiffs

because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

703. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Illinois Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

704. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Illinois Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

705. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

706. As a result of said nonconformities, Illinois Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Illinois Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

707. Illinois Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their

vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Illinois Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Illinois Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

708. Illinois Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

709. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Illinois at 810 Ill. Comp. Stat. 5/2-101 *et. seq.*

710. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Illinois at 810 Ill. Comp. Stat. 5/2-101 *et. seq.*

711. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became

part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Illinois law.

712. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

713. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Illinois Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Illinois Plaintiffs. Among other things, Illinois Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Illinois Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

714. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Illinois Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

715. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Illinois Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

716. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

717. As a result of said nonconformities, Illinois Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Illinois Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

718. Illinois Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Illinois Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express

warranties, Illinois Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

719. Illinois Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

720. Illinois Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

721. Illinois Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Illinois Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

722. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Illinois at 810 Ill. Comp. Stat. 5/2-101 *et. seq.*

723. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Illinois at Illinois at 810 Ill. Comp. Stat. 5/2-101 *et. seq.*

724. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Illinois at as adopted by Illinois at 810 Ill. Comp. Stat. 5/2-101 *et. seq.*

725. FCA provided Illinois Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

726. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

727. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

728. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and

others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Illinois Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

729. Illinois Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Illinois Plaintiffs.

730. Illinois Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Illinois Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

731. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Illinois Plaintiffs

732. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

733. Illinois Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased

gasoline costs and various consequential damages. Illinois Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

734. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

735. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Illinois at 810 Ill. Comp. Stat. 5/2-101 *et. seq.*

736. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Illinois at Illinois at 810 Ill. Comp. Stat. 5/2-101 *et. seq.*

737. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Illinois at as adopted by Illinois at 810 Ill. Comp. Stat. 5/2-101 *et. seq.*

738. FCA provided Illinois Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

739. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

740. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

741. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Illinois Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

742. Illinois Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the

warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Illinois Plaintiffs.

743. Illinois Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Illinois Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

744. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Illinois Plaintiffs

745. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

746. Illinois Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Illinois Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

## FIFTH CAUSE OF ACTION – FRAUDULENT CONCEALMENT/FRAUD BY OMISSION

747. Illinois Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

748. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

749. Under Illinois law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

750. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable

risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

751. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Illinois Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

752. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Illinois Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

753. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Illinois Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

754. Illinois Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Illinois Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

755. As a result of FCA's omissions and concealments, Illinois Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

756. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Illinois Plaintiffs. FCA's' conduct warrants

an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

757. Illinois Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

758. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

759. Illinois Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Illinois Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

760. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Illinois Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**(815 CS 505/1, et. seq. and 720 ILCS 295/1a)**

761. The Illinois Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

762. FCA is a "person" as that term is defined in 815 ILCS 505/1(c). The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. FCA's aforementioned conduct intentionally violated the Illinois CFA.

763. FCA violated the Illinois CFA as a result of its manufacture and sale of vehicles with the Defects, which FCA failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of these vehicles, which had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality and standard, and protected by FCA's warranty, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

764. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in FCA's business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including the Illinois Plaintiffs, and imposed a serious safety risk on the public.

765. FCA knew that the Vehicles and their batteries suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use of providing reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of vehicles, FCA failed to disclose and actively concealed the Defects in the Vehicles as described above.

766. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through its advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

b. Representing that the Vehicles and their electric batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sales or leases to the Illinois Plaintiffs, FCA knew or had reason to know that the Vehicles had inherent and systemic Defects, as described in this Complaint, but FCA failed to disclose this material information to the Illinois Plaintiffs;

e. Failing to reveal material facts which misled Illinois Plaintiffs and which facts could not reasonably have been known by the Illinois Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law;

h. Entering into a consumer transaction in which the Illinois Plaintiffs purportedly waived a right, benefit, or immunity provided by law, without clearly stating the waiver and obtaining the Illinois Plaintiffs' specific consent to the waiver.

FCA's violative practices were specifically designed to induce, and did in fact induce, the Illinois Plaintiffs to purchase or lease their Vehicles.

767. The Illinois Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their batteries.

768. Upon information and belief, these violations were not due to a bona fide error, as FCA failed to have any procedures in place designed to prevent the violations, and engaged in the same unfair and deceptive acts or practices in connection with the sale or lease of numerous other vehicles. FCA continued to engage in these unlawful practices.

769. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the Illinois Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the Illinois Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

770. FCA had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Illinois UTPA in the course of their business.

771. FCA's violations present a continuing risk to the Illinois Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

772. Pursuant to 815 ILCS 505/10a(a), the Illinois Plaintiffs sue FCA for actual damages, plus punitive damages because FCA acted with fraud and/or malice and/or were grossly negligent and their conduct was willful or intentional and done with evil motive or reckless indifference to the rights of others. FCA's conduct resulted in public injury constituted a pattern or an effect on consumers and the public interest. The Illinois Plaintiffs also seek attorney's fees and costs per 815 ILCS § 505/10a(c) plus any other just and proper relief available under the Illinois CFA.

## MARYLAND CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

773. Maryland Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

774. Maryland Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

775. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

776. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and Maryland Plaintiffs in fact purchased it wholly or primarily for personal use.

777. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

778. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that

the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Maryland law.

779. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

780. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Maryland Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Maryland Plaintiffs. Among other things, Maryland Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Maryland Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

781. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to

make Maryland Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

782. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Maryland Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

783. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

784. As a result of said nonconformities, Illinois Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Illinois Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

785. Maryland Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Maryland Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified

herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Maryland Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

786. Maryland Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

787. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

788. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

789. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Maryland law.

790. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all

parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

791. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Maryland Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Maryland Plaintiffs. Among other things, Maryland Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Maryland Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

792. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Maryland Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

793. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Maryland Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not

required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

794. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

795. As a result of said nonconformities, Maryland Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Maryland Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

796. Maryland Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Maryland Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Maryland Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

797. Maryland Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

798. Maryland Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

799. Maryland Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Maryland Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

800. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

801. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

802. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Md. Code Ann., Com. Law § 2-314 *et. seq.*

803. FCA provided Maryland Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience

premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

804. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

805. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

806. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Maryland Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

807. Maryland Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Maryland Plaintiffs.

808. Maryland Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Maryland Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

809. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Maryland Plaintiffs

810. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

811. Maryland Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. Maryland Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

812. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

813. The Subject Vehicles are and were at all relevant times “goods” within the meaning of Article 2 of the Uniform Commercial Code (“UCC”), as adopted by Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

814. FCA is and was at all relevant times a “merchant” with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code (“UCC”), as adopted by Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

815. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code (“UCC”), as adopted by Maryland at Md. Code Ann., Com. Law § 2-314 *et. seq.*

816. FCA provided Maryland Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

817. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing

reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

818. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

819. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Maryland Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

820. Maryland Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Maryland Plaintiffs.

821. Maryland Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Maryland

Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

822. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Maryland Plaintiffs

823. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

824. Maryland Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Maryland Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FIFTH CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

825. Maryland Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

826. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only

provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

827. Under Maryland law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

828. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

829. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts,

and FCA knew they were not known to or reasonably discoverable by Maryland Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

830. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Maryland Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

831. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Maryland Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

832. Virginia Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Maryland Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

833. As a result of FCA's omissions and concealments, Maryland Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

834. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Maryland Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

835. Maryland Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

836. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

837. Maryland Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Maryland Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

838. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Maryland Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT**
**(MD. CODE ANN., COM. LAW § 13-101 ET SEQ.)**

839. The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and

"[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE ANN., COM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged, MD. CODE ANN., COM. LAW § 13-302. FCA's aforementioned conduct violated this statute.

840. FCA and the Maryland Plaintiffs are "persons" within the meaning of MD. CODE ANN., COM. LAW § 13-101(h).

841. FCA violated the Maryland CPA as a result of its manufacture and sale of the Defective Vehicles, which FCA failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of the Vehicles, which had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality and standard, and protected by FCA's warranty, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

842. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in FCA's business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including the Maryland Plaintiffs, and imposed a serious safety risk on the public.

843. FCA knew that the Vehicles and their batteries suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use of providing reliable transportation. In the course of FCA's business of manufacturing, distributing,

and advertising the sale of vehicles, FCA failed to disclose and actively concealed the Defects described above.

844. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through its advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

b. Representing that the Vehicles and their electric batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sales or leases to the Maryland Plaintiffs, FCA knew or had reason to know that the Vehicles had inherent and systemic Defects, as described in this Complaint, but FCA failed to disclose this material information to the Maryland Plaintiffs;

e. Failing to reveal material facts which misled Maryland Plaintiffs and which facts could not reasonably have been known by the Maryland Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law;

h. Entering into a consumer transaction in which the Maryland Plaintiffs purportedly

waived a right, benefit, or immunity provided by law, without clearly stating the waiver and obtaining the Maryland Plaintiffs' specific consent to the waiver.

845. Ford's violative practices were specifically designed to induce, and did in fact induce, the Maryland Plaintiffs to purchase or lease their Vehicles.

846. The Maryland Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their batteries.

847. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the Maryland Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the Maryland Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

848. Pursuant to MD. CODE ANN., COM. LAW § 13-408, the Maryland Plaintiffs seek actual damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Maryland CPA.

## MAINE CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

849. Maine Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

850. Maine Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

851. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

852. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and Maine Plaintiffs in fact purchased it wholly or primarily for personal use.

853. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

854. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Maine law.

855. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

856. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty

limitations are unenforceable because FCA knowingly sold a defective product to Maine Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Maine Plaintiffs. Among other things, Maine Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Maine Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

857. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Maine Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

858. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Maine Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

859. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

860. As a result of said nonconformities, Oregon Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Oregon Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

861. Maine Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Maine Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Maine Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

862. Maine Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

863. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maine at Me. Stat. Tit. 11, § 2-101 *et. seq.*

864. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maine at Me. Stat. Tit. 11, § 2-101 *et. seq.*

865. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Maine law.

866. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

867. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Maine Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Maine Plaintiffs. Among other things, Maine Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Maine Plaintiffs

because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

868. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Maine Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

869. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Maine Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

870. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

871. As a result of said nonconformities, Maine Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Maine Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

872. Maine Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their

vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Maine Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Maine Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

873. Maine Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

874. Maine Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Maine Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

875. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maine at Me. Stat. Tit. 11, § 2-101 *et. seq.*

876. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maine at Me. Stat. Tit. 11, § 2-101 *et. seq.*

877. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maine at Maine at Me. Stat. Tit. 11, § 2-314.

878. FCA provided Maine Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

879. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

880. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent

and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

881. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Maine Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

882. Maine Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Maine Plaintiffs.

883. Maine Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Maine Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

884. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Maine Plaintiffs

885. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

886. Maine Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. Maine Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

887. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

888. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maine at Me. Stat. Tit. 11, § 2-101 *et. seq.*

889. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maine at Va Me. Stat. Tit. 11, § 2-101 *et. seq.*

890. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maine at Maine at Me. Stat. Tit. 11, § 2-314.

891. FCA provided Maine Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience

premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

892. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

893. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

894. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Maine Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

895. Maine Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Maine Plaintiffs.

896. Maine Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Maine Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

897. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Maine Plaintiffs

898. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

899. Maine Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Maine Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FIFTH CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

900. Maine Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

901. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

902. Under Maine law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

903. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made

its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

904. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Maine Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

905. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Maine Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

906. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Maine Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

907. Maine Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Maine Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

908. As a result of FCA's omissions and concealments, Maine Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

909. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Maine Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

910. Maine Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

911. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

912. Maine Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Maine Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

913. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Maine Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT**
**(ME. REV. STAT. ANN. TIT. 5, § 205-A ET SEQ.)**

914. Maine Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

915. The Maine Unfair Trade Practices Act (Maine UTPA) makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." ME. REV. STAT. ANN. TIT. 5, § 207. FCA's aforementioned conduct violated this statute.

916. FCA and the Maine Plaintiffs are "persons" within the meaning of ME. REV. STAT. ANN. TIT. § 5, 206(2).

917. FCA is engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. ANN. TIT. § 5, 206(3).

918. FCA violated the Maine CPA as a result of its manufacture and sale of the Defective Vehicles, which FCA failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of the Vehicles, which had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality and standard, and protected by FCA's warranty, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

919. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in FCA's business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including the Maine Plaintiffs, and imposed a serious safety risk on the public.

920. FCA knew that the Vehicles and their batteries suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use of providing reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of vehicles, FCA failed to disclose and actively concealed the Defects described above.

921. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through its advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

b. Representing that the Vehicles and their electric batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sales or leases to the Maine Plaintiffs, FCA knew or had reason to know that the Vehicles had inherent and systemic Defects, as described in this Complaint, but FCA failed to disclose this material information to the Maine Plaintiffs;

e. Failing to reveal material facts which misled Maine Plaintiffs and which facts could not reasonably have been known by the Maine Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law;

h. Entering into a consumer transaction in which the Maine Plaintiffs purportedly waived a right, benefit, or immunity provided by law, without clearly stating the waiver and obtaining the Maine Plaintiffs' specific consent to the waiver.

922. FCA's violative practices were specifically designed to induce, and did in fact induce, the Maine Plaintiffs to purchase or lease their Vehicles.

923. The Maine Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their batteries.

924. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the Maine Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the Maine Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

925. Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, the Maine Plaintiffs sue FCA for actual damage plus punitive damages under Maine law plus attorneys' fees and costs per Me. Rev. Stat. Ann. Tit. 5 § 213(2), plus any other just and proper relief available under the Maine UTPA.

## MINNESOTA CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

926. Minnesota Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

927. Minnesota Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

928. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

929. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and Minnesota Plaintiffs in fact purchased it wholly or primarily for personal use.

930. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

931. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Minnesota law.

932. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

933. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Minnesota Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Minnesota Plaintiffs. Among other things, Minnesota Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Minnesota Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

934. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Minnesota Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

935. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Minnesota Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

936. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was

provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

937. As a result of said nonconformities, Oregon Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Oregon Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

938. Minnesota Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Minnesota Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Minnesota Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

939. Minnesota Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

940. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Minnesota at Minn. Stat. § 336.2-101 *et. seq.*

941. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Minnesota at Minn. Stat. § 336.2-101 *et. seq.*

942. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Minnesota law.

943. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

944. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Minnesota Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Minnesota Plaintiffs. Among other things, Minnesota Plaintiffs had no

meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Minnesota Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

945. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Minnesota Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

946. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Minnesota Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

947. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

948. As a result of said nonconformities, Minnesota Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Minnesota Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

949. Minnesota Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Minnesota Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Minnesota Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

950. Minnesota Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

951. Minnesota Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Minnesota Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

952. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Minnesota at Minn. Stat. § 336.2-101 *et. seq.*

953. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Minnesota at Minn. Stat. § 336.2-101 *et. seq.*

954. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Minnesota at Minnesota at Minn. Stat. § 336.2-314.

955. FCA provided Minnesota Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

956. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

957. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent

and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

958. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Minnesota Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

959. Minnesota Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Minnesota Plaintiffs.

960. Minnesota Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Minnesota Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

961. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Minnesota Plaintiffs

962. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

963. Minnesota Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. Minnesota Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

964. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

965. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Minnesota at Minn. Stat. § 336.2-101 *et. seq.*

966. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Minnesota at Minn. Stat. § 336.2-101 *et. seq.*

967. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Minnesota at Minnesota at Minn. Stat. § 336.2-314.

968. FCA provided Minnesota Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable

quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

969. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

970. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

971. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles,

Minnesota Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

972. Minnesota Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Minnesota Plaintiffs.

973. Minnesota Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Minnesota Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

974. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Minnesota Plaintiffs

975. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

976. Minnesota Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Minnesota

Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FIFTH CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

977. Minnesota Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

978. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

979. Under Minnesota law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

980. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

981. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Minnesota Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

982. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Minnesota Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

983. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Minnesota Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

984. Minnesota Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Minnesota Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

985. As a result of FCA's omissions and concealments, Minnesota Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

986. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Minnesota Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

987. Minnesota Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

988. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

989. Minnesota Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Minnesota Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

990. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Minnesota Plaintiffs. FCA's' conduct

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT**
**(MINN. STAT. § 325D.43-48 ET SEQ.)**

991. Minnesota Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

992. The Minnesota Deceptive Trade Practices Act (Minnesota DTPA) prohibits deceptive trade practices, which include "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1). FCA's aforementioned conduct violated this statute.

993. FCA violated the Minnesota DTPA as a result of its manufacture and sale of the Defective Vehicles, which FCA failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of the Vehicles, which had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality and standard, and protected by FCA's warranty, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

994. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in FCA's business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the

purchasing public, including the Minnesota Plaintiffs, and imposed a serious safety risk on the public.

995. FCA knew that the Vehicles and their batteries suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use of providing reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of vehicles, FCA failed to disclose and actively concealed the Defects described above.

996. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through its advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

b. Representing that the Vehicles and their electric batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sales or leases to the Minnesota Plaintiffs, FCA knew or had reason to know that the Vehicles had inherent and systemic Defects, as described in this Complaint, but FCA failed to disclose this material information to the Minnesota Plaintiffs;

e. Failing to reveal material facts which misled Minnesota Plaintiffs and which facts could not reasonably have been known by the Minnesota Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law;

h. Entering into a consumer transaction in which the Minnesota Plaintiffs purportedly waived a right, benefit, or immunity provided by law, without clearly stating the waiver and obtaining the Minnesota Plaintiffs' specific consent to the waiver.

997. FCA's violative practices were specifically designed to induce, and did in fact induce, the Minnesota Plaintiffs to purchase or lease their Vehicles.

998. The Minnesota Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their batteries.

999. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the Minnesota Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the Minnesota Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

1000. Pursuant to MINN. STAT. § 8.31(3a), the Minnesota Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

1001. The Minnesota Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that FCA's acts show deliberate disregard for the rights of others.

## NORTH CAROLINA CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

1002. North Carolina Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

1003. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

1004. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and North Carolina Plaintiffs in fact purchased it wholly or primarily for personal use.

1005. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

1006. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under North Carolina law.

1007. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that

is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

1008. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to North Carolina Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect North Carolina Plaintiffs. Among other things, North Carolina Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the North Carolina Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

1009. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make North Carolina Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

1010. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. North Carolina Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1011. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1012. As a result of said nonconformities, Oregon Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Oregon Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

1013. North Carolina Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, North Carolina Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, North Carolina Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

1014. North Carolina Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

1015. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Carolina at N.C. Gen. Stat. § 25-2-101 *et. seq*.

1016. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Carolina at N.C. Gen. Stat. § 25-2-101 *et. seq.*

1017. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under North Carolina law.

1018. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

1019. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to North Carolina Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect North Carolina Plaintiffs. Among other things, North Carolina Plaintiffs

had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the North Carolina Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

1020. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make North Carolina Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

1021. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. North Carolina Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1022. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1023. As a result of said nonconformities, North Carolina Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. North Carolina Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

1024. Minnesota Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, North Carolina Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, North Carolina Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

1025. North Carolina Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1026. North Carolina Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). North Carolina Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

1027. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Carolina at N.C. Gen. Stat. § 25-2-101 *et. seq.*

1028. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Carolina at N.C. Gen. Stat. § 25-2-101 *et. seq.*

1029. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Carolina at N.C. Gen. Stat. § 25-2-314.

1030. FCA provided North Carolina Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1031. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1032. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent

and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1033. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, North Carolina Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1034. North Carolina Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with North Carolina Plaintiffs.

1035. North Carolina Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. North Carolina Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1036. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including North Carolina Plaintiffs

1037. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1038. North Carolina Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. North Carolina Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

1039. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1040. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Carolina at N.C. Gen. Stat. § 25-2-101 *et. seq.*

1041. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Carolina at N.C. Gen. Stat. § 25-2-101 *et. seq.*

1042. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by North Carolina at N.C. Gen. Stat. § 25-2-314.

1043. FCA provided North Carolina Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of

merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1044. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1045. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1046. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles,

North Carolina Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1047. North Carolina Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with North Carolina Plaintiffs.

1048. North Carolina Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. North Carolina Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1049. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including North Carolina Plaintiffs

1050. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1051. North Carolina Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. North

Carolina Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FIFTH CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

1052. North Carolina Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1053. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

1054. Under North Carolina law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

1055. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

1056. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by North Carolina Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

1057. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the North Carolina Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

1058. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce North Carolina Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1059. North Carolina Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of North Carolina Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

1060. As a result of FCA's omissions and concealments, North Carolina Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

1061. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of North Carolina Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

1062. North Carolina Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1063. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

1064. North Carolina Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, North Carolina Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

1065. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of North Carolina Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION -**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT**
**(N.C. GEN. STAT. § 75-1.1 ET SEQ.)**

1066. North Carolina Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1067. North Carolina's Unfair and Deceptive Acts and Practices Act (the North Carolina Act) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a). FCA's aforementioned conduct violated this statute.

1068. FCA engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

1069. FCA violated the North Carolina Act as a result of its manufacture and sale of the Defective Vehicles, which FCA failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of the Vehicles, which had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality and standard, and protected by FCA's warranty, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

1070. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in FCA's business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the

purchasing public, including the North Carolina Plaintiffs, and imposed a serious safety risk on the public.

1071. FCA knew that the Vehicles and their batteries suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use of providing reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of vehicles, FCA failed to disclose and actively concealed the Defects described above.

1072. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through its advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

b. Representing that the Vehicles and their electric batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sales or leases to the North Carolina Plaintiffs, FCA knew or had reason to know that the Vehicles had inherent and systemic Defects, as described in this Complaint, but FCA failed to disclose this material information to the North Carolina Plaintiffs;

e. Failing to reveal material facts which misled North Carolina Plaintiffs and which facts could not reasonably have been known by the North Carolina Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law;

h. Entering into a consumer transaction in which the North Carolina Plaintiffs purportedly waived a right, benefit, or immunity provided by law, without clearly stating the waiver and obtaining the North Carolina Plaintiffs' specific consent to the waiver.

1073. FCA's violative practices were specifically designed to induce, and did in fact induce, the North Carolina Plaintiffs to purchase or lease their Vehicles.

1074. The North Carolina Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their batteries.

1075. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the North Carolina Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the North Carolina Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

1076. The North Carolina Plaintiffs seek monetary relief for their actual damages, an order for treble their actual damages, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

## OHIO CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

1077. Ohio Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

1078. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

1079. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and Ohio Plaintiffs in fact purchased it wholly or primarily for personal use.

1080. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

1081. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Ohio law.

1082. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that

is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

1083. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Ohio Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Ohio Plaintiffs. Among other things, Ohio Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Ohio Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

1084. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Ohio Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

1085. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Ohio Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1086. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1087. As a result of said nonconformities, Oregon Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Oregon Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

1088. Ohio Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Ohio Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Ohio Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

1089. Ohio Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

1090. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Ohio at Ohio Rev. Code Ann. § 1302.01 *et. seq.*

1091. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Ohio at Ohio Rev. Code Ann. § 1302.01 *et. seq*.

1092. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Ohio law.

1093. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

1094. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Ohio Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Ohio Plaintiffs. Among other things, Ohio Plaintiffs had no meaningful

choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Ohio Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

1095. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Ohio Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

1096. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Ohio Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1097. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1098. As a result of said nonconformities, Ohio Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Ohio Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

1099. Minnesota Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Ohio Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Ohio Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

1100. Ohio Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1101. Ohio Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Ohio Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

1102. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Ohio at Ohio Rev. Code Ann. § 1302.01 *et. seq.*

1103. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Ohio at Ohio Rev. Code Ann. § 1302.01 *et. seq.*

1104. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Ohio at Ohio Rev. Code Ann. § 1302.27.

1105. FCA provided Ohio Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1106. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1107. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent

and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1108. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Ohio Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1109. Ohio Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Ohio Plaintiffs.

1110. Ohio Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Ohio Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1111. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Ohio Plaintiffs

1112. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1113. Ohio Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. Ohio Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

1114. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1115. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Ohio at Ohio Rev. Code Ann. § 1302.01 *et. seq.*

1116. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Ohio at Ohio Rev. Code Ann. § 1302.01 *et. seq.*

1117. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Ohio at Ohio Rev. Code Ann. § 1302.27.

1118. FCA provided North Carolina Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not

experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1119. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1120. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1121. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Ohio Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1122. Ohio Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Ohio Plaintiffs.

1123. Ohio Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Ohio Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1124. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Ohio Plaintiffs

1125. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1126. Ohio Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Ohio Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FIFTH CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

1127. Ohio Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1128. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

1129. Under Ohio law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

1130. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made

its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

1131. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Ohio Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

1132. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Ohio Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

1133. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Ohio Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1134. Ohio Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Ohio Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

1135. As a result of FCA's omissions and concealments, Ohio Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

1136. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Ohio Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

1137. Ohio Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1138. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

1139. Ohio Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Ohio Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

1140. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Ohio Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION -**
**VIOLATION OF THE OHIO TRADE PRACTICES AND CONSUMER PROTECTION ACT**
**OHIO STAT. § 45.50.471, *et seq.***

1141. Ohio Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1142. FCA is a "supplier" as that term is defined in OHIO REV. CODE ANN. § 1345.01(C).

1143. The Ohio Plaintiffs are "consumers" as that term is defined in OHIO REV. CODE ANN. § 1345.01(D), and their purchase or lease of one or more Vehicles is a "consumer transaction" within the meaning of OHIO REV. CODE ANN. § 1345.01(A).

1144. The Ohio Consumer Sales Practices Act (Ohio CSPA), OHIO REV. CODE ANN. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits (1) representing that Fraudulent Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Fraudulent Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer. OHIO REV. CODE ANN. § 1345.02. FCA's aforementioned conduct violated this statute.

1145. FCA violated the Ohio Act as a result of its manufacture and sale of the Defective Vehicles, which FCA failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of the Vehicles, which had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality

and standard, and protected by FCA's warranty, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

1146. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in FCA's business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including the Ohio Plaintiffs, and imposed a serious safety risk on the public.

1147. FCA knew that the Vehicles and their batteries suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use of providing reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of vehicles, FCA failed to disclose and actively concealed the Defects described above.

1148. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through its advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

b. Representing that the Vehicles and their electric batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sales or leases to the Ohio Plaintiffs, FCA knew or had reason to know that the Vehicles had inherent and systemic Defects, as described in this Complaint, but FCA failed to disclose this material information to the Ohio Plaintiffs;

e. Failing to reveal material facts which misled Ohio Plaintiffs and which facts could not reasonably have been known by the Ohio Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law;

h. Entering into a consumer transaction in which the Ohio Plaintiffs purportedly waived a right, benefit, or immunity provided by law, without clearly stating the waiver and obtaining the Ohio Plaintiffs' specific consent to the waiver.

1149. FCA's violative practices were specifically designed to induce, and did in fact induce, the Ohio Plaintiffs to purchase or lease their Vehicles.

1150. The Ohio Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their batteries.

1151. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the Ohio Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the Ohio Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

1152. As a result of the foregoing wrongful conduct, the Ohio Plaintiffs have been damaged in an amount to be proven at trial and seek all just and proper remedies, including but

not limited to actual and statutory damages, treble damages, court costs, and reasonable attorneys' fees, pursuant to OHIO REV. CODE ANN. § 1345.09 et seq.

## WISCONSIN CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

1153. Wisconsin Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

1154. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

1155. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and Wisconsin Plaintiffs in fact purchased it wholly or primarily for personal use.

1156. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

1157. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Wisconsin law.

1158. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited

Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

1159. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to Wisconsin Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Wisconsin Plaintiffs. Among other things, Wisconsin Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Wisconsin Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

1160. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Wisconsin Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

1161. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Wisconsin Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not

required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1162. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1163. As a result of said nonconformities, Oregon Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Oregon Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

1164. Wisconsin Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Wisconsin Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Wisconsin Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

1165. Wisconsin Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

1166. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wisconsin at Wisc. Stat. § 402.101 *et. seq.*

1167. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wisconsin at Wisc. Stat. § 402.101 *et. seq.*

1168. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under Wisconsin law.

1169. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

1170. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty

limitations are unenforceable because FCA knowingly sold a defective product to Wisconsin Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Wisconsin Plaintiffs. Among other things, Wisconsin Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the Wisconsin Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

1171. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Wisconsin Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

1172. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. Wisconsin Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1173. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1174. As a result of said nonconformities, Wisconsin Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Wisconsin Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

1175. Minnesota Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, Wisconsin Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, Wisconsin Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

1176. Wisconsin Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1177. Wisconsin Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Wisconsin Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

1178. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wisconsin at Wisc. Stat. § 402.101 *et. seq.*

1179. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wisconsin at Wisc. Stat. § 402.101 *et. seq.*

1180. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wisconsin at Wisc. Stat. § 402.314.

1181. FCA provided Wisconsin Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1182. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their

range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1183. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1184. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Wisconsin Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1185. Wisconsin Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Wisconsin Plaintiffs.

1186. Wisconsin Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Wisconsin Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1187. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Wisconsin Plaintiffs

1188. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1189. Wisconsin Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. Wisconsin Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

1190. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1191. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wisconsin at Wisc. Stat. § 402.101 *et. seq.*

1192. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wisconsin at Wisc. Stat. § 402.101 *et. seq.*

1193. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Wisconsin at Wisc. Stat. § 402.314.

1194. FCA provided Wisconsin Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1195. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1196. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent

and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1197. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Wisconsin Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1198. Wisconsin Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Wisconsin Plaintiffs.

1199. Wisconsin Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Wisconsin Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1200. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Wisconsin Plaintiffs

1201. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1202. Wisconsin Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Wisconsin Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FIFTH CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

1203. Wisconsin Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1204. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

1205. Under Wisconsin law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and

conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

1206. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

1207. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Wisconsin Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

1208. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Wisconsin Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

1209. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Wisconsin Plaintiffs to purchase

the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1210. Wisconsin Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Wisconsin Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

1211. As a result of FCA's omissions and concealments, Wisconsin Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

1212. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Wisconsin Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

1213. Wisconsin Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1214. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

1215. Wisconsin Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Wisconsin Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

1216. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Wisconsin Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION -**
**VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT**
**(WIS. STAT. § 100.18)**

1217. Wisconsin Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1218. The Wisconsin Plaintiffs are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

1219. The Wisconsin Plaintiffs purchased or leased one or more Vehicle.

1220. The Wisconsin Plaintiffs are "persons" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).

1221. The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1). In the course of its business, through its agents, employees, and/or subsidiaries, FCA violated the Wisconsin DTPA.

1222. FCA violated the Wisconsin DTPA as a result of its manufacture and sale of the Defective Vehicles, which FCA failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of the Vehicles, which had

the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality and standard, and protected by FCA's warranty, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

1223. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in FCA's business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including the Wisconsin Plaintiffs, and imposed a serious safety risk on the public.

1224. FCA knew that the Vehicles and their batteries suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use of providing reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of vehicles, FCA failed to disclose and actively concealed the Defects described above.

1225. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through its advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

b. Representing that the Vehicles and their electric batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sales or leases to the Wisconsin Plaintiffs, FCA knew or had reason to know that the Vehicles had inherent and systemic Defects, as described in this Complaint, but FCA failed to disclose this material information to the Wisconsin Plaintiffs;

e. Failing to reveal material facts which misled Wisconsin Plaintiffs and which facts could not reasonably have been known by the Wisconsin Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law;

h. Entering into a consumer transaction in which the Wisconsin Plaintiffs purportedly waived a right, benefit, or immunity provided by law, without clearly stating the waiver and obtaining the Wisconsin Plaintiffs' specific consent to the waiver.

1226. FCA's violative practices were specifically designed to induce, and did in fact induce, the Wisconsin Plaintiffs to purchase or lease their Vehicles.

1227. The Wisconsin Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their batteries.

1228. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the Wisconsin Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had

the Wisconsin Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

1229. The Wisconsin Plaintiffs hereby sue FCA for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages plus court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2) plus any other just and proper relief available under the Wisconsin DTPA.

## WEST VIRGINIA CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

1230. West Virginia Plaintiffs are "consumers" as defined in 15 U.S.C. § 2301(3).

1231. FCA is a "supplier" and a "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

1232. The Vehicles are a "consumer product" as defined in 15 U.S.C. § 2301(1), because it is normally used for personal purposes and West Virginia Plaintiffs in fact purchased it wholly or primarily for personal use.

1233. The Vehicles were covered by a "written warranty" or a "service contract" as those terms are defined in 15 U.S.C. § 2301(6) and 2301(8), respectively.

1234. The Vehicles were covered by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, the Defective Vehicles had an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicles to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and

workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under West Virginia law.

1235. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

1236. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to West Virginia Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect West Virginia Plaintiffs. Among other things, West Virginia Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the West Virginia Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

1237. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to

make West Virginia Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

1238. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. West Virginia Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1239. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1240. As a result of said nonconformities, Oregon Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. Oregon Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

1241. West Virginia Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles suffered from the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, West Virginia Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein

as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, West Virginia Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**SECOND CAUSE OF ACTION –**
**BREACH OF EXPRESS WARRANTY**

1242. West Virginia Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

1243. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by West Virginia at W. Va. Code § 46-2-101 *et. seq.*

1244. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by West Virginia at W. Va. Code § 46-2-101 *et. seq.*

1245. The Vehicles were covered by an express written warranty that covered the Vehicles, including but not limited to the batteries, and FCA warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. FCA also warranted that the Defective Vehicles' high voltage battery packs were free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship. These express warranties became part of the basis of the parties' bargain. Accordingly, FCA's warranties are express warranties under West Virginia law.

1246. The Defective Vehicles are covered by a new vehicle limited warranty, including a Basic Limited Warranty for three years and 36,000 miles and High Voltage Battery Limited Warranty for eight years and 100,000 miles. The Basic Limited Warranty "covers the cost of all

parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The Basic Limited Warranty and High Voltage Battery Limited Warranty apply to anyone who is "a purchaser for use of the vehicle."

1247. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because FCA knowingly sold a defective product to West Virginia Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect West Virginia Plaintiffs. Among other things, West Virginia Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and the West Virginia Plaintiffs because FCA knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

1248. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make West Virginia Plaintiffs whole and because FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

1249. FCA breached its warranties by selling and leasing the Subject Vehicles with the Battery Defect and FORM Defect, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods. West Virginia Plaintiffs presented their vehicles to FCA-authorized dealers for repair and notified FCA of its breaches within a reasonable time, and/or

were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1250. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1251. As a result of said nonconformities, West Virginia Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation. West Virginia Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to their acceptance of the subject vehicles.

1252. Minnesota Plaintiffs would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles had the Battery Defect and FORM Defect. As a direct and proximate result of FCA's willful failure to comply with its obligations under the express warranties, West Virginia Plaintiffs suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein as well as overpayment at the time of sale. As a direct and proximate result of FCA's breach of express warranties, West Virginia Plaintiffs have been damaged in an amount to be determined at trial for which they now sue together with an award of costs and attorneys' fees.

**THIRD CAUSE OF ACTION -**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")**

1253. West Virginia Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1254. West Virginia Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). West Virginia Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

1255. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by West Virginia at W. Va. Code § 46-2-101 *et. seq.*

1256. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by West Virginia at W. Va. Code § 46-2-101 *et. seq.*

1257. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by West Virginia at W. Va. Code § 46-2-314.

1258. FCA provided West Virginia Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1259. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate.

In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1260. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1261. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, West Virginia Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1262. West Virginia Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with West Virginia Plaintiffs.

1263. West Virginia Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. West

Virginia Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1264. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including West Virginia Plaintiffs

1265. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1266. West Virginia Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages. West Virginia Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FOURTH CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

1267. Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

1268. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by West Virginia at W. Va. Code § 46-2-101 *et. seq.*

1269. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by West Virginia at W. Va. Code § 46-2-101 *et. seq.*

1270. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by West Virginia at W. Va. Code § 46-2-314.

1271. FCA provided West Virginia Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

1272. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

1273. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to

its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

1274. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, West Virginia Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

1275. West Virginia Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with West Virginia Plaintiffs.

1276. West Virginia Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. West Virginia Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

1277. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources,

from the federal class action complaint and directly from consumers, including West Virginia Plaintiffs

1278. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

1279. West Virginia Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. West Virginia Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**FIFTH CAUSE OF ACTION –**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

1280. West Virginia Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1281. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

1282. Under West Virginia law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be

disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

1283. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

1284. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by West Virginia Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

1285. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the West Virginia Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

1286. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce West Virginia Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1287. West Virginia Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of West Virginia Plaintiffs were justified and they reasonably relied on FCA's omissions and suffered damages as a result.

1288. As a result of FCA's omissions and concealments, West Virginia Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

1289. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of West Virginia Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SIXTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

1290. West Virginia Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1291. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of

the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather. FCA also made partial misleading representations in the Vehicles' warranty books as to the duration of FORM and ability of the Vehicles to exit FORM.

1292. West Virginia Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, West Virginia Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles and various consequential damages.

1293. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of West Virginia Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SEVENTH CAUSE OF ACTION -**
**VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT**
**(W. VA. CODE § 46A-1-101 ET SEQ.)**

1294. West Virginia Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1295. FCA is a "person" under W. VA. CODE § 46A-1-102(31).

1296. The West Virginia Plaintiffs are "consumers" as defined by W. VA. CODE §§ 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Vehicles.

1297. FCA engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

1298. The West Virginia Consumer Credit and Protection Act (West Virginia CCPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." W. VA. CODE § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include:

a. Advertising goods or services with intent not to sell them as advertised; . . .

b. Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

c. The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; [and]

d. Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.

W. VA. CODE § 46A-6-102(7). FCA's aforementioned conduct violated this statute.

1299. FCA violated the West Virginia CCPA as a result of its manufacture and sale of the Defective Vehicles, which FCA failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of the Vehicles, which had the tendency or capacity to mislead. By failing to disclose and by intentionally concealing the Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality and standard, and protected by FCA's warranty, FCA knowingly and intentionally misrepresented and omitted material facts and breached its legal duties.

1300. FCA's unfair and deceptive acts or practices occurred repeatedly, systematically and continuously in FCA's business of manufacturing, distributing, and advertising the sale of vehicles, were capable of deceiving, and did in fact deceive, a substantial portion of the purchasing public, including the West Virginia Plaintiffs, and imposed a serious safety risk on the public.

1301. FCA knew that the Vehicles and their batteries suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use of providing reliable transportation. In the course of FCA's business of manufacturing, distributing, and advertising the sale of vehicles, FCA failed to disclose and actively concealed the Defects described above.

1302. FCA engaged in the following violative acts or practices in the conduct of trade or commerce:

a. Representing through its advertising, warranties, and other express representations that the Vehicles and their electric batteries had benefits or characteristics that they did not actually have;

b. Representing that the Vehicles and their electric batteries were of a particular standard or quality when they were not;

c. Advertising the Vehicles and their batteries with the intent not to sell them as advertised and, when so doing, concealing and suppressing facts material to the true characteristics, standards and qualities of the Vehicles and their batteries;

d. At the time of the sales or leases to the West Virginia Plaintiffs, FCA knew or had reason to know that the Vehicles had inherent and systemic Defects, as described in

this Complaint, but FCA failed to disclose this material information to the West Virginia Plaintiffs;

e. Failing to reveal material facts which misled West Virginia Plaintiffs and which facts could not reasonably have been known by the West Virginia Plaintiffs;

f. Attempting to disclaim or limit the implied warranty of merchantability and fitness for use without clearly and conspicuously disclosing same;

g. Failing to provide promised benefits under the warranty, both expressly or implied by operation of law;

h. Entering into a consumer transaction in which the West Virginia Plaintiffs purportedly waived a right, benefit, or immunity provided by law, without clearly stating the waiver and obtaining the West Virginia Plaintiffs' specific consent to the waiver.

1303. FCA's violative practices were specifically designed to induce, and did in fact induce, the West Virginia Plaintiffs to purchase or lease their Vehicles.

1304. The West Virginia Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their batteries.

1305. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the West Virginia Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the West Virginia Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

1306. The West Virginia Plaintiffs seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in

the amount of $200 per violation of the West Virginia CCPA for each West Virginia Plaintiff. Plaintiffs also seek punitive damages against FCA because it carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiffs to cruel and unjust hardship as a result.

## LIMITATIONS

## PLAINTIFFS' CLAIMS ARE TIMELY UNDER LAW OR EQUITY

### Class Action Tolling

1307. Plaintiffs gave timely notice of his claims against FCA in the present action as a putative class member in the following class actions (the "Class Actions"):

- *Crowell v. FCA US, LLC*, United States District Court, District of Delaware, Case No. 1:23-cv-00013-MN, which was filed on January 5, 2023;
- *Frisch v. FCA US, LLC*, United States District Court, Eastern District of Michigan, Case No. 2:24-cv-10546-BRM, which was filed on March 4, 2024; and
- *Aiello v. FCA US, LLC*, United States District Court, Eastern District of Michigan, Case No. 2:26-cv-11365-BRM, which was filed on April 24, 2026.

1308. There is no prejudice to FCA in gathering evidence to defend against Plaintiffs' individual claims because the class definition in the Class Action complaints within which Plaintiffs are putative class members and the allegations in the class action lawsuit put FCA on notice of the facts that give rise to Plaintiffs' individual actions, the witnesses necessary for FCA to defend Plaintiffs' individual actions, and the causes of action against FCA asserted in Plaintiffs' individual action.

1309. The Class Plaintiffs alleged the same material facts on behalf of Plaintiffs as putative class members as are being alleged by Plaintiffs in the present individual action.

1310. The facts alleged in the Class Actions are substantially similar, if not identical to the facts alleged herein.

1311. The allegations in the Class Actions are based on the same subject matter and similar evidence as the instant complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

1312. The Class Actions protected the efficiency and economy of litigation because that class action is protecting the rights of thousands of consumers nationwide through a single action. Consumer class actions regarding defective vehicles brought against manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

1313. The tolling of Plaintiffs' individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action device, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

1314. The running of all statute of limitations on Plaintiffs' claims asserted against FCA in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the Class Actions.

**The Discovery Rule**

1315. The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

1316. Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs could not have discovered that FCA was concealing and misrepresenting the true properties and capabilities of their Vehicles.

1317. Plaintiff could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect that FCA had intentionally failed to disclose the existence and effect of the Defective Batteries and defective FORMs.

1318. Likewise, a reasonable and diligent investigation could not have disclosed that FCA had information in its possession about the existence of the Defective Batteries and FORM Defect and that they concealed that information.

**Fraudulent Concealment**

1319. Throughout the relevant time period, all applicable statutes of limitation have been tolled by FCA's knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

1320. Well before the date of this Complaint, FCA knew of the existence of the Defective Batteries and FORM Defect, but continued to distribute, sell, and/or lease the Defective Vehicles. In doing so, FCA concealed and expressly denied the existence of the Defective Batteries and FORM Defect and/or failed to notify Plaintiff and others about the true nature of the Defective Vehicles.

1321. Instead of disclosing its deception and the existence of the Defective Batteries and FORM Defect, FCA falsely represented that its vehicles were safe and reliable and fit for their ordinary purpose.

**Estoppel**

1322. FCA had a continuous and on-going duty to tell the truth about the Defective Vehicles and to disclose to consumers including Plaintiff the facts that they knew about the Defective Batteries and FORM Defect.

1323. Although FCA had the duty throughout the relevant period to disclose to Plaintiffs the existence of the Defective Batteries, FORM Defect and Defective Vehicles, FCA chose to intentionally misrepresent and conceal the existence of these defects and the fact that the Defective Vehicles were unfit for their ordinary purpose.

1324. FCA actively concealed the true character, quality, performance, and nature of the Defective Vehicles, Defective Batteries and FORM Defect. Plaintiffs reasonably relied upon FCA's knowing and active concealment of these facts. Thus, FCA is estopped from relying on any statutes of limitations in defense of this action.

**ARBITRATION**

1325. In similar litigation, FCA has alleged that claims such as the instant case are subject to arbitration based on arbitration language in a warranty booklet. Plaintiffs assert that they are not bound by this provision because they never agreed to it and because:

- There was no mutual assent to the arbitration provision;
- FCA never adequately conveyed to Plaintiffs an offer to arbitrate;
- Plaintiffs had no notice of the arbitration provision;
- The arbitration provision was neither disclosed nor discussed during the transactions in which Plaintiffs obtained their vehicles;
- Plaintiffs did not receive the warranty booklet containing the arbitration provision during the transactions in which Plaintiffs obtained their vehicles;

- Plaintiffs did not receive the warranty booklet containing the arbitration provision when they took possession of their vehicles;
- Plaintiffs never signed an "Agreement to Arbitrate," which was a condition precedent to the formation of any arbitration agreement;
- Plaintiffs never signed an "Arbitration Acknowledgment Form," which was a condition precedent to the formation of any arbitration agreement;
- Plaintiffs timely and validly opted out of the alleged arbitration provision by letter to FCA dated July 7, 2026.

1326. In similar litigation, FCA has alleged that claims such as the instant case are subject to arbitration based on arbitration language in agreements between consumers and the dealers from whom they leased or purchased their vehicles. Plaintiffs assert that FCA, as a non-party to any such agreement, cannot enforce it against Plaintiffs.

**ATTORNEYS' FEES**

1327. Plaintiffs seek all reasonable and necessary attorneys' fees in this case, which include the following.

a. preparation and trial of this lawsuit;

b. post-trial, pre-appeal legal services; and

c. an appeal to the Third Circuit Court of Appeals;

**CONDITIONS PRECEDENT**

1328. All notices and other conditions precedent to Plaintiffs' rights to recover herein have been performed, have occurred or have been excused.

## JURY DEMAND

1329. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial of this matter and tenders the proper jury fee with the filing of this Complaint.

## CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully prays that FCA be cited to appear and answer herein, and that upon final trial, they recover their actual damages, consequential damages, additional statutory damages, exemplary damages, attorney's fees, costs of court, pre-judgment and post-judgment interest at the highest legal rates, and such other and further relief, both general and special, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

/s/ *Antranig Garibian*
Antranig Garibian, Esquire
(Bar No. 4962)
**GARIBIAN LAW OFFICES, P.C.**
Brandywine Plaza East
1523 Concord Pike, Suite 400
Wilmington, DE 19803
Tel. (302) 722-6885
Email: ag@garibianlaw.com

Eric D. Pearson
Texas State Bar No. 15690472
eric@hop-law.com
Charles E. Miller
Texas State Bar No. 276523
charles@hop-law.com
**HEYGOOD, ORR & PEARSON**
6363 N. State Highway 161, Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**ATTORNEYS FOR PLAINTIFFS**